UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | |
| v. | ) | Case No. 1:07cv211-S |
| KEITH BEAUCHAMP, et al., Defendants. | ) | |

**PLAINTIFF UNITED STATES' MOTION TO COMPEL NON-PARTY WITNESS JOHN T. SHEEHAN TO RESPOND TO QUESTIONS AT DEPOSITION AND PRODUCE DOCUMENTS**

The plaintiff United States of America, through undersigned counsel, hereby moves for an order pursuant to Fed. R. Civ. P. 37(a) and 45(c)(2)(B)(i) & (e) compelling John T. Sheehan, a non-party witness served with a subpoena (attached as Exhibit G)[1] to testify and produce documents in this action, to answer questions in deposition and produce documents. Sheehan refused to answer several questions at his July 10, 2008 deposition based on claims of attorney-client privilege. Sheehan also refused to produce any documents at all on the same grounds, although no privilege log was produced as required by Fed. R. Civ. P. 45(d)(2). Sheehan's assertions of privilege are frivolous and Sheehan should be compelled to reappear for a continuation of the deposition and to answer questions and produce the requested documents. Sheehan should further be ordered, under Fed. R. Civ. P. 37(a)(5)(A) and 45(e), to reimburse the

[1] All exhibits are attached hereto and incorporated herein.

United States for travel costs and court reporter fees incurred in connection with the July 10 deposition.[2]

## Statement of Facts

### A. Sheehan's Role In Jeffrey Rose's Scheme To Circumvent The Federal Tax Lien On The 25 Raymond Drive Property

This action arises from the IRS's efforts to collect about $750,000 of unpaid income taxes owed by Jeffrey Rose, and Rose's efforts to evade collection. At the time the IRS assessed those unpaid taxes against Rose, he owned (in the name of a corporation called Borland Realty, Inc., of which he was the president and sole shareholder) a parcel of real estate at 25 Raymond Drive, Narragansett, Rhode Island (the "25 Raymond Drive property"). On November 9, 2004, the IRS filed Notices of Federal Tax Lien with the Narragansett Town Clerk against Jeffrey Rose and Borland Realty, Inc. as his alter ego or nominee. The federal tax liens attached to Jeffrey Rose's interest in the 25 Raymond Drive property.

Several years before, a mortgage had been recorded on the 25 Raymond Drive property, granted to a purported partnership called "Kaleb Realty."[3] This mortgage (hereinafter, the

---

[2] Undersigned counsel hereby certifies pursuant to Fed. R. Civ. P. 37(a)(1) that he repeatedly met and conferred with Sheehan's counsel James O'Neil, but was unable to resolve this dispute absent judicial intervention.

[3] According to a document entitled "Kaleb Realty Partnership Agreement", the partners were Jeffrey Rose, his father Viriato Rose, and the "Rose Family Trust." Viriato Rose has since admitted that there was no such thing as the "Rose Family Trust" at the time the partnership agreement was purportedly executed. (Exhibit A, Deposition of Viriato Rose ("V. Rose Dep.") 46.) Viriato Rose further testified that he had never seen a copy of the Kaleb Realty Partnership Agreement before, even though his purported signature appears on the document. (*Id.* at 44.) When asked about the business dealings of Kaleb Realty in deposition, Viriato Rose invoked his Fifth Amendment right and refused to answer. This testimony indicates that Kaleb Realty was nothing more than a sham.

"Kaleb Mortgage") purportedly secured a $52,000 note made to Kaleb Realty by the Nomar Realty Trust,[4] the record title owner of the 25 Raymond Drive property previous to Borland Realty, Inc. In reality, the Nomar Realty Trust and Kaleb Realty were merely creatures of Jeffrey Rose. There is no evidence that the Kaleb Mortgage secured a bona fide debt, and it is uncontested that no payments were ever made toward any debt secured by the Kaleb Mortgage.[5]

After the Notices of Federal Tax Lien were filed, Jeffrey Rose (who had fled the country and remains abroad) crafted a scheme that would permit him to circumvent the tax liens on the 25 Raymond Drive property, sell the property to a third party, and take the proceeds of that sale without exposing those proceeds to the IRS's collection efforts. To facilitate this effort, Jeffrey Rose turned to a Newport attorney named John Sheehan.

Rose and Sheehan came to believe that, under a provision of the Internal Revenue Code,[6] if the holder of a senior lien on property subject to a junior federal tax lien forecloses on that senior lien, and the IRS does not redeem the property within 120 days of that foreclosure, then the federal tax lien is discharged as to that property. Accordingly, Rose and Sheehan devised a sham transaction involving the assignment of the Kaleb Mortgage to a shell entity controlled by Rose, the subsequent foreclosure of that mortgage, and (in the event that the IRS failed to redeem) the subsequent sale to a third party, with the proceeds of that sale going to Rose without being exposed to IRS collection efforts. (Exhibit D, Memorandum from Sheehan to Rose.)

---

[4] Jeffrey Rose signed the note as "trustee" of Nomar Realty Trust.

[5] When asked in deposition about the Kaleb Mortgage and the alleged underlying debt, Viriato Rose invoked his Fifth Amendment right and refused to answer.

[6] 26 U.S.C. §7425(b).

To that end, Sheehan (at Rose's behest) created an entity called Raymond 25 Associates LLC, a Rhode Island limited liability company. This entity had three members, Sheehan, Harold Panciera (nominally the managing partner), and Don Colletti. None of these individuals contributed any capital to Raymond 25 Associates, however, and Rose (through Sheehan) controlled all aspects of Raymond 25 Associates throughout its existence. (Exhibit B, Deposition of Harold Panciera, individually and as Raymond 25 Associates' Rule 30(b)(6) witness ("Panciera Dep.") 33-34, 49-51.)

Sheehan then drafted an Assignment Agreement purporting to assign the Kaleb Mortgage to Raymond 25 Associates. The Assignment Agreement contemplated that Raymond 25 Associates would foreclose on the Kaleb Mortgage, wait 120 days to see if the IRS redeemed the Property, and proceed to sell the Property to a genuine third party purchaser if the IRS did not exercise its redemption rights. No money would change hands between Raymond 25 Associates and Kaleb Realty until after the sale to a third party, at which time at least the bulk of the proceeds of the sale would go to Rose (with three "members" of Raymond 25 Associates taking at most a nominal cut of those proceeds). (Exhibit E, Assignment Agreement.)

Significantly, the Assignment Agreement provided that while Raymond 25 Associates would hold record title to the mortgage after the assignment, and record title to the property after the contemplated foreclosure, in fact Rose (in the name of Kaleb Realty) would control the 25 Raymond Drive property throughout. Further, in the event that the IRS exercised its redemption rights, or there was any legal challenge to the foreclosure, the Assignment Agreement provided

that the entire transaction would be unwound and the assignment cancelled. *(Id.*; Exhibit C, Deposition of John Sheehan ("Sheehan Dep.") 102.)[7]

While the Assignment Agreement purports to be signed by Viriato Rose on behalf of Kaleb Realty, in deposition Viriato Rose denied that he had ever seen the agreement before and testified that the signature was not his. (Exhibit A, V. Rose Dep. 42-44.)[8] It is uncontested, however, that Jeffrey Rose reviewed and approved the Assignment Agreement. (Exhibit C, Sheehan Dep. 99; Exhibit F, Email to Sheehan.)

In short, the entire structure of the transaction was designed to ensure that Jeffrey Rose retained control of the 25 Raymond Drive property until it could be sold to a third party, at which point Rose would receive the proceeds of the sale from that third party (minus transaction costs and a cut for Sheehan and the other "members" of Raymond 25 Associates) out of the reach of the IRS.

All went according to Rose's (and Sheehan's) plan. After the Assignment Agreement was executed, Sheehan held a foreclosure sale on the 25 Raymond Drive property in the name of Raymond 25 Associates. Unsurprisingly, Raymond 25 Associates was the only bidder, "purchasing" the property for itself, nominally for $300,000 (although no money actually

---

[7] As further evidence of the true nature of this scheme, Sheehan testified that he and Rose discussed setting an artificially high "foreclosure" price for the property so that the IRS would be forced to overpay in order to redeem its interest in the property, and therefore be less likely to exercise its redemption rights under the statute. (Exhibit D; Exhibit C, Sheehan Dep. 95-96.)

[8] When asked further questions about the Assignment Agreement or about any transactions involving the 25 Raymond Drive property, Viriato Rose invoked his Fifth Amendment right and refused to answer.

changed hands). After allegedly notifying the IRS and waiting 120 days, Sheehan (on behalf of Raymond 25 Associates) entered into negotiations with Defendants Wayne and Keith Beauchamp to sell the property. Ultimately, the Beauchamps purchased the property for $350,000. According to Panciera (the managing member of Raymond 25 Associates), those proceeds were sent to Sheehan, who promptly sent the proceeds (minus expenses, Sheehan's legal fees, and a fee of approximately $20,000 for each of the three members of Raymond 25 Associates) to Jeffrey Rose. (Exhibit B, Panciera Dep. 26-28, 67-68.)

**B. Sheehan's Repeated Invocations Of Attorney-Client Privilege And Non-Compliance With The United States' Subpoena**

In discovery in this action, the United States served a subpoena to Raymond 25 Associates, the entity at the core of this transaction. In response to that subpoena, Panciera (as the Rule 30(b)(6) representative of Raymond 25 Associates) appear for deposition and produced documents in his personal custody regarding this transaction. Panciera confirmed Sheehan's central role in structuring and managing this transaction. (*Id.* at 33-40.) Indeed, Panciera testified that Sheehan was the person most knowledgable about Raymond 25 Associates' involvement in the transaction, but that Sheehan had refused Panciera's request to testify as the corporate representative. (*Id.* at 9.) Panciera also produced, among other things, emails between him, Sheehan, and Rose that indicate Sheehan's central role in structuring this scheme. In one of those emails, Sheehan took credit for his efforts: "Do I do good work or what. As you can see, no cash to Seller [i.e., no payments between 25 Raymond Associates and Rose] until the deal is done. What a great lawyer I am!!!" (Exhibit F, Email from Sheehan.)

The United States then issued a subpoena to Sheehan for his deposition and the production of documents on six topics related to the transaction. (Exhibit G, Subpoena.) After Sheehan was served, and after discussions with Sheeehan's counsel, James O'Neil, the deposition took place on July 10, 2008, in Providence.

At the deposition, Mr. Sheehan invoked attorney-client privilege no less than 60 times and refused to answer virtually any questions regarding his involvement in the transaction at issue.[9] Among the subjects as to which Sheehan refused to answer questions were the following:

- Whether Sheehan or the other members of Raymond 25 Associates infused any capital into the transaction. (Exhibit C, Sheehan Dep. 11-14.)
- Whether any money changed hands between Jeffrey Rose/Kaleb Realty and Raymond 25 Associates. (*Id.* at 19, 69, 100-03.)
- What happened to the proceeds from the subsequent sale to the Beauchamps, including whether Jeffrey Rose ever received a share of those proceeds. (*Id.* at 23-24, 35-37, 106.)
- Whether any payments had ever been made on the alleged Kaleb Mortgage mortgage. (*Id.* at 37-39, 98.)
- Negotiations between Rose and members of Raymond 25 Associates regarding the Assignment Agreement. (*Id.* at 76-77.)
- Factual questions regarding the structure of the transaction. (*Id.* at 7, 42-44, 78-80, 95-96.)
- The telephone number and email address that Sheehan has used to contact Rose since Rose fled the country. (*Id.* at 25-27, 57-59, 104-05.)

---

[9] Because Sheehan invoked the privilege so frequently throughout his deposition, the United States attaches the entire deposition transcript of Sheehan's deposition as Exhibit C.

Sheehan invoked the privilege at various times on behalf of Raymond 25 Associates,[10] Kaleb Realty, Jeffrey Rose, Viriato Rose, and an unnamed person who he refused to identify.

In addition, Sheehan testified that he currently maintains at his home office files related to Rose and to the transaction at issue in this case. (*Id.* at 47-51, 53-55.) He further testified that after receiving the subpoena he reviewed those files and determined that they contained documents responsive to the subpoena. (*Id.)* Sheehan nonetheless refused to produce any documents at all because of "attorney-client privilege." (*Id.* at 48-49.) Sheehan did not, however, bother to prepare a privilege log or provide any further information describing the privileged nature of the information in these documents. (*Id.*)

**Argument**

There is no question that Sheehan's testimony on the above topics, and the documents requested in the subpoena, are both relevant to this action and reasonably calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26(b)(1). The United States has alleged that the federal tax liens against Jeffrey Rose (and/or his nominee Borland Realty, Inc.) continue to attach to the 25 Raymond Drive property. Defendants have contended that the foreclosure by Raymond 25 Associates (and the IRS's non-redemption of the property) released the federal tax

[10] Notably, Raymond 25 Associates provided documents (including the emails attached as Exhibits D and F) and testimony (through its Rule 30(b)(6) witness) regarding advice Sheehan provided on many of these topics. (Exhibit B, Panciera Dep. 16-19.) Any privilege as to Raymond 25 Associates is accordingly waived and Sheehan cannot assert any privilege on its behalf. *See Cavallaro v. United States*, 284 F.3d 236, 246-49 (1st Cir. 2002) (if a communication is disclosed to a third party for a purpose unrelated to the giving of legal advice (*i.e.*, the disclosure was not necessary, or at least highly useful, to facilitate the giving of legal advice), the privilege is waived); *accord Ft. James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1349 (Fed. Cir. 2005); *Nguyen v. Excel Corp.*, 197 F.3d 200, 207 (5th Cir. 1999).

liens from the property. The scheme engineered by Sheehan that is outlined above demonstrates that the entire transaction was a sham designed to evade the collection of taxes, and the United States contends that the federal tax liens continue to attach despite that sham transaction. *See, e.g.*, *Dewees v. Commissioner*, 870 F.2d 21, 29-30 (1st Cir. 1989) (Breyer, J.) (When the underlying transaction is merely a "device to avoid tax liability," courts must disregard that transaction as a sham for tax purposes even if it "technically complied with tax code provisions") (citations omitted); *Nichols v. Flagg*, 51 A. 1039 (R.I. 1902) (setting aside purported foreclosure on property by senior lienholder who contrived to "sell" the property to a related party in order to "cut out" a junior lien). The testimony and documents sought from Sheehan bear directly on this issue.

The only objection raised to this discovery is Sheehan's invocation of attorney- client privilege. Sheehan bears the burden of proving the existence of a privilege he invokes. *United States v. Wilson*, 798 F.2d 509, 512 (1st Cir. 1986). As shown below, Sheehan cannot meet that burden and his invocation of the privilege lacks merit.

To begin with, the topics addressed by the deposition questions and document requests do not implicate the attorney-client privilege at all. "The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981). Nor does the privilege extend to business advice or the content of negotiations between the parties to a transaction, merely because an attorney happens to be the conduit for that information. *See, e.g., Winchester Capital Management Co. v. Manufacturers Hanover Trust Co.*, 144 F.R.D. 170,

174-75 (D. Mass. 1992) (communications with attorney discussing structure of transaction were in the nature of business advice and therefore not privileged); *United States v. Wilson*, 798 F.2d 509, 512-13 (1st Cir. 1986) (no attorney-client privilege over communications involving attorney who was "messenger" between parties negotiating a transaction, absent evidence that the party claiming the privilege specifically retained attorney for legal advice). Sheehan cannot invoke the privilege and refuse to answer questions regarding those topics because that information is not privileged. Sheehan's repeated invocation of the privilege to prevent disclosure of the underlying facts of the transaction, such as the money trail resulting from the transaction, communications regarding how to structure the transaction from a business perspective, and the content of negotiations between the parties to the transaction, cannot be sustained.

To the extent that the questions on these topics did implicate genuine communications of legal advice, Sheehan still cannot invoke the privilege on behalf of Jeffrey Rose or any of his entities. The nature of this transaction provides "a reasonable basis to believe" that Jeffrey Rose "was engaged in (or was planning) criminal or fraudulent activity when the attorney-client communications took place; and [] that the communications were intended by [Rose] to facilitate or conceal the criminal or fraudulent activity," thereby vitiating any privilege claim under the crime-fraud exception. *In re Grand Jury Proceedings*, 417 F.3d 18, 22-23 (1st Cir. 2005) (citing *In re Grand Jury Proceedings (Gregory P. Violette)*, 183 F.3d 71, 75 (1st Cir. 1999)). It is undisputed that Sheehan was instrumental in Rose's scheme to circumvent the federal tax liens and frustrate the IRS's collection efforts. He structured the transaction, managed the sale of the property to a third party, and transferred the proceeds of that sale to Rose. Any advice that

Sheehan gave in connection with this scheme was given in furtherance of those efforts to circumvent the tax lien on the property. Accordingly, the crime-fraud exception makes Sheehan's communications regarding that transaction discoverable even if otherwise privileged. *Cendant Corp. v. Shelton*, 246 F.R.D. 401, 405-06 (D. Conn. 2007) (crime-fraud exception permits breach of attorney-client privilege regarding formation and operation of entities to which defendant allegedly transferred assets in order to defraud creditors).

Finally, Sheehan cannot use the privilege as an excuse to withhold production of documents in his files. Even if Sheehan had a legitimate privilege claim for some of information contained in these documents–and as shown above he does not–his failure to prepare a privilege log means that he has waived any such privilege. Rule 45(d)(2)(A) requires a subpoenaed witness to "describe the nature of" information withheld on an assertion of privilege sufficient to "enable the parties to assess the claim." Fed. R. Civ. P. 45(d)(2)(A). Sheehan did not even attempt to comply with this requirement. Accordingly, Sheehan has waived any privilege as to that information and may not withhold any documents on that ground. *In re Grand Jury Subpoena*, 274 F.3d 563, 575-76 (1st Cir. 2001) ("A party that fails to submit a privilege log is deemed to waive the underlying privilege claim" under Rule 45(d)(2)); *Corvello v. New England Gas Co.*, 243 F.R.D. 28, 35-36 (D.R.I. 2007) (Torres, J.) (failure to establish a "reliable basis" for an asserted claim of privilege via a sufficient privilege log constituted waiver of the privilege and required production of withheld documents).

**Request for Award of Costs**

Counsel for the United States traveled from his office in Washington, D.C., to Providence to conduct Sheehan's deposition, at a cost of $313.03. In addition, counsel retained the Callaghan Reporting Service as the court reporter and deposition officer, at a cost of $410.00. These costs were incurred solely for purposes of Sheehan's deposition–a deposition which proved largely fruitless due to Sheehan's improper invocation of the privilege and failure to respond to questions or produce documents. Given that the United States will again have to incur these costs for a second deposition if this motion is granted, this Court should order Sheehan to reimburse the United States for these costs. Fed. R. Civ. P. 37(a)(5)(A) & 45(e).

**Conclusion**

For the above reasons, the United States requests that this Court compel Sheehan to 1) appear for a further deposition at the time and place designated by the United States and respond to questions on the above referenced topics without asserting the attorney-client privilege, 2) produce documents in his possession, custody, or control as demanded in the subpoena at the time and place designated by the United States, 3) pay the United States' costs of appearing for the previous deposition of Sheehan (including travel costs and court reporter fees) in the amount of $723.03, and 4) award such further relief as the Court deems necessary to ensure Sheehan's compliance with his obligations to respond to the subpoena.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

/s/ Robert J. Kovacev
ROBERT J. KOVACEV
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6541

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that service of the foregoing has this 21st day of August, 2008, been made upon the following electronically via ECF and by Federal Express, respectively, to:

James P. Marusak, Esquire
Gidley, Sarli & Marusak
One Turk's Head Place
Suite 900
Providence, Rhode Island 02903

James E. O'Neil, Esquire
1130 Ten Rod Road
The Meadows
Suite A-103
North Kingstown, Rhode Island 02852
(counsel for John T. Sheehan)

/s/ Robert J. Kovacev
ROBERT J. KOVACEV
Trial Attorney, Tax Division