IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES :
:
VS. :
: C.A. No. 1:07cv211S
KEITH BEAUCHAMP, et al. :

DEPOSITION of HAROLD T. PANCIERA, JR., a witness in the above-entitled cause, taken on behalf of the Government, before Melanie M. Chace, RPR, Notary Public in and for the State of Rhode Island, held at the UNITED STATES ATTORNEY'S OFFICE, Fleet Center, 50 Kennedy Plaza, 8th Floor, Providence, Rhode Island, on March 11, 2008, at 10:00 a.m.

PRESENT:

FOR THE GOVERNMENT......US DEPT. OF JUSTICE, TAX DIV.
P.O. Box 55
Benjamin Franklin Station
Washington, D.C. 20044
BY: ROBERT J. KOVACEV, Esq.

FOR THE DEFENDANTS......GIDLEY SARLI & MARUSAK, LLP
BY: JAMES P. MARUSAK, Esq.

GOVERNMENT EXHIBIT
B

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

INDEX


| WITNESS | PAGE |
|---|---|
| HAROLD T. PANCIERA, JR. | |
| EXAMINATION BY MR. KOVACEV.................. | 4 |
| EXAMINATION BY MR. MARUSAK................. | 79 |


GOVERNMENT EXHIBITS FOR ID


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Photocopy of Subpoena (4pp) | 4 |
| 2 | Photocopy of Chronology, Subject: 25 Raymond Drive (2pp) | 14 |
| 3 | Photocopy of Outline of Proposal from John to Jeff (2pp) | 22 |
| 4 | Printout of E-mail Dated 7/9/05 (1pg) | 23 |
| 5 | Printout of E-mail Dated 7/10/05 (2pp) | 23 |
| 6 | Printout of E-mail Dated 7/21/05 (2pp) | 23 |
| 7 | Printout of E-mail Address (1pg) | 23 |
| 8 | Photocopy of Agreement (10pp) | 30 |
| 9 | Photocopy of Documents Faxed from Hal Panciera to Rob Kovacev (29pp) | 43 |
| 10 | Photocopy of Fax from Kevin Carter to John Sheehan (6pp) | 54 |
| 11 | Photocopy of Purchase and Sale Agreement (3pp) | 59 |
| 12 | Photocopy of Amendment and Addendum to Purchase and Sale Agreement (1pg) | 61 |
| 13 | Photocopy of Documents Faxed from Peter Hainley to Atty. Sheehan (4pp) | 62 |





| | | |
|---|---|---|
| 14 | Photocopy of Documents Faxed from Harold Panciera to Matt West (4pp) | 68 |
| 15 | Photocopy of Documents Faxed from Harold Panciera to Matt West (3pp) | 70 |
| 16 | Photocopy of Return of Partnership Income (18pp) | 74 |
| 17 | Photocopy of Closing Statement (5pp) | 77 |
| 18 | Photocopy of Authorization to Disburse Closing Proceeds (19pp) | 77 |




(DEPOSITION COMMENCED AT 10:09 a.m.)
(GOVT. EXHIBIT 1 MARKED FOR ID)
HAROLD T. PANCIERA, JR.
Being duly sworn, deposes and testifies as follows:
THE REPORTER: Would you state your full name for the record, please.
THE WITNESS: Harold T. Panciera, Jr.
EXAMINATION BY MR. KOVACEV
Q. Good morning, Mr. Panciera, I know we've met before, my name is Robert Kovacev, I'm a trial attorney for the US Department of Justice, and I'm representing the United States in a civil case in Federal Court, the United States versus Keith Beauchamp, et al. You're here for a deposition in that case?
A. Correct.
Q. Have you ever been deposed before?
A. I have.
Q. How many times?
A. Three or four.
Q. What kind of cases were those, just generally speaking?
A. Civil.
Q. Were you there as a witness, third-party witness, or as a party?
A. Both.
Q. Since you're a grizzled veteran, I'll be brief. I'll



be asking you questions, later on, if Mr. Marusak, who represents the defendants, wants to ask you questions, he will have an opportunity to do so. Answer them to the best of your ability. If I ask you questions that you don't understand, I would appreciate if you would let me know right away so I can try to fix the question so we both understand what we're talking about. Can you do that?
A. I will.
Q. If you need to take a break, if you need to go to the rest room, let me know, and we'll take a break at your convenience, and there is some water here, for your convenience, also.
A. Great.
Q. The one thing I do ask is if there is a question that is pending, answer it first, then we can take a break; do you agree to that?
A. Sure, that's fine.
Q. Is there any reason why we can't start now?
A. None.
Q. Let's start with what has been marked as Government Exhibit 1, if you'll take a look at that?
(WITNESS PERUSING DOCUMENT)
A. Okay.
Q. Is this a subpoena that you received in this case?

Page 6

A. Yes.
Q. The subpoena is directed to 25 Raymond Associates?
A. Yes.
Q. Is it 25 Raymond or Raymond 25?
A. I think it is Raymond 25 Associates.
Q. But you're here representing Raymond 25 Associates for the purposes of the subpoena?
A. Yes.
Q. If you'll look at the third and fourth pages of Exhibit 1?
A. Okay.
Q. If you'll look at Roman Numeral II, Categories of Documents to be Produced, you've produced several documents before today; correct?
A. Correct.
Q. And there are a couple of documents that you just gave me this morning, that we'll take a look at in a minute?
A. Yes.
Q. Other than that, are there any documents that you're aware of that are responsive to any of the categories listed under Roman Numeral II?
A. The only thing that might be, and I was remiss in not scrutinizing this in more detail, I may have access -- let me think. No, I don't, I don't think we even had a bank account, so I don't think we had a

Page 7

bank. I was thinking that we might have had a bank account, checking account, but I don't believe we did. No, we didn't.
Q. I guess, if you didn't have a bank account, how did you manage the financial affairs of Raymond 25?
A. Never had any expenditures, the entity was created for the express purpose of buying a piece of property in Narragansett, and to rehab it, and to resell it. It was a speculative real estate investment, there was no money needed to consummate the purchase, it was done on an installment sale basis. There were some expenditures for the payment of taxes, which were fronted by one of the partners. But for that, I don't think we had any other expenses.
Q. You say the expenditures were fronted by one of the partners?
A. Paid for, and they were outstanding property taxes, if memory serves me correctly.
Q. Which partner was that?
A. Donald Coletti.
Q. Before we go on, looking at the documents to be produced, just to close the circle, have you produced all the documents that you're aware of?
A. Everything that I have, yes.
Q. You're prepared to testify today about Raymond 25

Page 8

Associates?
A. I am.
Q. You mentioned the partners, who are the partners in Raymond 25?
A. John Sheehan, Donald Coletti and myself.
Q. Who is John Sheehan?
A. He is an attorney, lives in Newport, Rhode Island.
Q. How about Mr. Coletti?
A. Don Coletti owns a realty company called Bruce Allen Realty, he is a long-time friend of mine.
Q. Before the transaction that we're talking about today, which is the purchase of the property on Raymond Avenue in Narragansett, had you ever dealt with Attorney Sheehan before that?
A. Yes.
Q. How many times?
A. Three or four.
Q. What kind of transactions were those?
A. Another, I bought a house at foreclosure in Bristol, Rhode Island. He represented -- provided the legal services and was a partner along with two other participants. He represented us in the acquisition of some travel plazas in Illinois, that was in 19 -- pardon me, 2003, I believe. He also had an equity interest in that, he received in addition to legal

Page 9

fees. He was involved in the development, or the pursuit of the development of some self-storage facilities in Florida. But he never had -- never ended up with an equity interest in it.
Q. Did you discuss the deposition today and the subpoena related to the deposition with Attorney Sheehan?
A. I did, as a matter of fact, and I would like to go on record as stipulating that he would have been a more appropriate person to be deposed than myself, because he was, he was the one who initiated the transaction, discovered it. My role was to participate in a financial, as well as my creditworthiness, in obtaining financing to consummate the acquisition, as well as the capital that was needed for improvements. Both myself and Mr. Coletti, that was our role in it.
But the answer is yes, I had, in fact, suggested, pursuant to our conversation that you were indifferent as to what member of our entity represented us at the deposition, that he should have been the one to attend the deposition as he was intimately involved in the transaction. He elected not to.
Q. Was Attorney Sheehan, did he represent Raymond 25 as an attorney, or just in his capacity as a partner?
A. As an attorney, and as a partner. Both.
Q. Did you understand him to represent any other parties

in the transaction involving the property in Narragansett?
A. Interesting question. He disclosed to me that he had a relationship with the owner of the real estate, and the extent of that relationship, I was unaware. Never did really know the extent of it. But apparently had had some past legal dealings with him.
Q. As far as the actual transaction involving the property in Narragansett, 25 Raymond, was he representing the sellers?
A. I don't know, he would have been the one to answer that question. I don't know.
Q. As far as you know, he was?
A. I don't know, I really don't, other than he's the one that drafted all the documents.
Q. You mentioned that there was a house in Bristol?
A. Yes.
Q. That you and Attorney Sheehan had purchased together; is that fair?
A. No, he had an interest in it. I actually purchased it, I provided the capital. We created another entity and he and two of my partners -- I shouldn't say I provided all of the capital, myself and two of my partners contributed the capital, Sheehan did the legal work that was involved, and for that he received an



equity position in the entity.
Q. Do you remember who you purchased the property in Bristol from?
A. Boy, I know his first name is Robert. I'll think of it in a minute. I honestly can't bring it to mind, but I will think of it.
Q. Just to step back a little bit, where do you work?
A. I'm a partner of Phoenix Financial Services, it is a limited liability company, our office is located at 23 Acorn Street in Providence. It is a company that I founded in 1988, it is comprised of three principals, myself and two partners. Our primary forte is in the commercial mortgage brokering business, which we do throughout the United States, as well as to develop some properties for -- buy property for our own inventory on a limited basis.
Q. So, what is your personal role? I know you said you are the founder.
A. I'm an equal to my two partners, where all three are managing members. It is a boutique company, it is a very small company, we each take on projects and, you know, depends on what comes over the transit, whether or not we're able do it, what project might fit one individual better than another. That is pretty much it.



Q. First, I would like to start with your education, starting after you graduated from high school?
A. Graduated from the University of Rhode Island in 1967, and taken a number of courses and seminars since then. I did earn the designation as a certified management consultant, done a lot of consulting work, that is the extent of my education.
Q. Did you have a major?
A. Marketing and advertising, as it was called back then, I think now it is marketing management, and I actually had a dual major, also industrial management.
Q. Between when you graduated and when you started Phoenix in 1988, was your experience mainly in the real estate area?
A. No, I actually worked with Shell Oil Company for ten years out of college. I always had an entrepreneurial spirit, and in 1976 decided to get into business for myself, and got into the service station business. Ended up at one time or another with ten stations and a couple of car washes, and I also -- I was an entrepreneurial junkie, by the way -- started a consulting business, built that up and sold it, developed -- you want me to go on the different things that I've done?
Q. If you could summarize, that would be helpful?



A. Built a roller-skating rink, started in and owned and operated a gourmet ice cream facility, owned a number of multifamily houses, then matriculated into the travel plaza business, 1980/'81, and built several large, as you would refer to them, truck stops throughout the country, from California to Iowa to Texas to on and on and on. The last facility that I had an interest in was in Massachusetts, and I divested myself from the petroleum business probably about, I'm guessing ten, 11 years ago. However, I did have the occasion, was doing some consulting work which resulted in us buying three truck stops in Illinois, as I mentioned earlier, which Mr. Sheehan provided legal services. We treated that as a real estate venture, we leased up the properties and ended up selling them.
I also own a self-storage facility in Pennsylvania, I'm partners in developing another self-storage facility in Ocala, Florida, which we're going to open the end of this month, beginning of April.
With two of my Phoenix partners, we're developing some real estate in conjunction with the City of Norwich, Connecticut. Some derelict properties that have been uninhabited for several years, we're going in and rehabbing that.

Page 14

I think that is the extent of my business activities. I'm sure there is something I've forgotten, but.
Q. Turning to the property at 25 Raymond in Narragansett and that transaction that you were involved in, what was the first time that you heard about a potential transaction involving that property?
A. From Sheehan, and I provided a -- tried to do a chronological sequencing, which I believe I provided you. I guesstimated that it was April or May of 2005 that Sheehan introduced this opportunity.
(GOV. EXHIBIT 2 MARKED FOR ID)
MR. KOVACEV: Just for the record, Exhibit 2 is a two-page document started at Bates Number RAY LLC 001.
Q. Can you take a look at that?
A. I have.
Q. Is this the chronology that you're talking about?
A. It is.
Q. The first item in the chronology is April/May, 2005?
A. Correct.
Q. Can you, I guess, is that when you first heard about a potential transaction?
A. Yes, Sheehan mentioned that, I referred to it in this, that he had a client who owned a piece of

Page 15

property and he was looking to sell it. That the house had been uninhabited for, I don't know, three years, something like that, but because of its location in Narragansett he felt it would be a good investment opportunity.
Q. Was this a face-to-face conversation?
A. Yes. He maintained an office, by the way, upstairs in our building at 23 Acorn Street in Attorney Keven McKenna's office. So he was a frequent visitor, he was there on a daily basis, so it wasn't uncommon for him to stop in.
Q. Was this the first time that he had stopped in and presented a potential business opportunity to you?
A. No, I mean, keep in mine, we had worked together on the purchase of the travel plazas and working on the property in Bristol, I think I had purchased that at that time. I'm not sure if we were doing anything on the self-storage facilities in Florida. But, no, it wasn't uncommon for him to stop in as he passed by. We're on the first floor, and he would have occasionally stopped in, said hello, and on his way upstairs.
Q. So, did he give you any papers at the first meeting?
A. No, no.
Q. Did he say who his client was at that time?

Page 16

A. No, no.
Q. Did he describe the client in any way?
A. Not to any further extent than what I just conveyed.
Q. In the conversation, what did you say?
A. I would be interested in taking a look at it, if there was an opportunity. Of course, back then, if you remember, in early 2005, you could virtually sell any piece of real estate you put a for sale sign on, so, we were interested in the opportunity.
Q. What was the next thing that happened?
A. I think -- if you don't mind me referring to this. Early June of '05 he informed me that his client wanted to move forward, told me he would accept $250,000, Sheehan felt it was a real bargain. I suggested involving Don Coletti of Bruce Allen, and the reason -- there were really two reasons. We were looking at this to acquire the property and to provide the capital for the improvements. If we were not as fortunate as we thought we might be in reselling it, there would be some carrying costs.
One of the things I wanted to do was to defray the amount of capital that I had to contribute, and that was one of the reasons why I suggested Don Coletti would be a good partner, in addition to the

Page 17

fact that Coletti is well-versed in the real estate market in Rhode Island. And I felt he would be very advantageous to us in flipping the property.
Q. At that time, I guess early June, 2005, did you discuss with Attorney Sheehan what the structure of the deal would be?
A. The three of us would be equal partners, that was the agreement. He would provide the legal services, we would handle the money end of it, securing of financing to acquire the property, as well as to make the capital improvements.
Q. Was there any discussion -- so, at that time did you understand that there would be an LLC that would be formed?
A. Yeah, I anticipated there would be, yeah, if it came to fruition, yeah, I did.
Q. At that time, June, 2005, did you understand that you would be -- the LLC would be purchasing the property outright, or would be taking assignment of the mortgage on the property, or some other way that required it?
A. He mentioned, he did disclose, you know, along the way, one of the things we did in mid June, as I mentioned, we went down and visually inspected the property. Don Coletti, myself and Sheehan. And Don has rehabbed a lot of properties, and I asked him to

Page 18

crystalize what he thought the cost of improvements would be, and based upon comparables when it was completed what could we expect to get. At the time he thought that -- he did provide, if I remember, a fairly detailed breakdown of what he thought the capital expenses would be to improve the property, and it was $37,900, and he thought that the market value would be between 400 to 410, and the asking price should be 429.

Sheehan had, in June, told me that he felt he could buy the property for $250,000. At some point, I'm not sure when, he disclosed to me that, in fact -- and we'll use these words, and I'm not sure that, in fact, they were his clients, but, I have been referring to them as his clients -- had a mortgage on the property and that there were some tax issues, some tax liens on the property and there was a question as to how we would make the purchase.

I was very specific that I was not interested in going in and buying a property at foreclosure, knowing that there was a right of redemption with the Internal Revenue Service. He then structured the agreement where there was an assignment of the mortgage to our entity and we then foreclosed on it. This was a -- that strategy is one he developed, he developed all of the appropriate agreements with the

Page 19

seller, correspondence relative to the foreclosure, correspondence to the Internal Revenue, he did all of that. All I did was to say, these are the grounds under which we would have an interest in investing in this.

If we were going to go in and buy the property outright, fix it up, put it on the market, we're ready to go, it makes sense, and Coletti was also of the same opinion, that it was a good investment opportunity. What we weren't going to do is go out and get a sizable mortgage on a piece of property and find out that there were other obligations and that the IRS was going to exercise its right of redemption.

So, again, Sheehan came up with this strategy, which I thought made sense. The mortgage would be assigned to us, we would foreclose on it. Give the IRS the right of redemption, and if, in fact, they exercised it, we walked away. You know, no harm done. If, in fact, they did not, they decided that they didn't want to exercise it, then, in fact, we would buy it, fix it up, and put it on the market.

Q. When you say the strategy that you're talking about that Attorney Sheehan developed, is that a strategy that you had ever seen used before?

A. No.

Page 20

Q. Have you ever seen it used since?

A. No, but, again, I don't deal with those kinds of properties. I really, you know, I don't consider myself to be an expert in those kinds of situations. I bought one property at foreclosure, and, quite frankly, I bought that property as an accommodation to the person that was losing his house. I didn't buy it because it was speculative. He was a client of Kevin McKenna and these poor people were down and out, this individual was crippled, I went in and bought the house and leased it back to him.

Q. That is not this?

A. That is not this. The point I'm making is, I really have had no other experience in foreclosed properties. Oliver. Robert Oliver is the guy in Bristol.

Q. Is that, so that --

A. That is the Bristol property, Robert Oliver.

Q. I would like to back up a little bit. Who did you understand Attorney Sheehan's, you refer to them as clients, you don't know if there was an actual attorney/client relationship, who were his clients, as he referred to them?

A. I only heard the name Rose, I heard the name Jeff Rose mentioned. At what time, I'm not sure when that

Page 21

was done. But I do know in July he corresponded with him, I knew he had corresponded with him. He had inferred that there had been correspondence. I'm not sure if there was written, I presume verbal. I did know, and I think I may have mentioned to you, I had a chance meeting with his father in Barrington.

Q. Jeff Rose's father?

A. Jeff Rose's father, I happened to be with Sheehan looking at a piece of property in Raynham, or in that area, and he had to meet with Mr. Rose. I remember the day as being very rainy, I was introduced to him, I stayed in Sheehan's vehicle, he got out and went into Mr. Roses vehicle, they met, he came back, we left, that's the extent of it.

The only other correspondence -- as I mentioned earlier, one of the things that I couldn't figure out, because I had no correspondence with them, and the E-mail or the memo that was E-mailed to Rose in July was on my computer and showed me as preparing the E-mail. I couldn't quite figure out how that happened, because I had no direct correspondence with him. And I, last night had the premonition to go on and check my old E-mails, and luckily, it was there, and I provided you this morning the trail where Sheehan had sent the memo to Rose and it was in Word Perfect. Rose couldn't

open the document, so Sheehan sent it to me and said, Would you type it up and send it to Rose? And, in fact, one of my E-mails was, Yes, I will, what is Rose's E-mail address? He then provided it. I typed it up and sent it to him.

MR. MARUSAK: First of all, when he says Rose, can we establish which Rose?

THE WITNESS: Jeff Rose.

MR. MARUSAK: Secondly, I haven't seen any of this stuff.

MR. KOVACEV: You're stealing my thunder.

Q. Just to orient our conversation, when you first appeared today you gave me some documents that I have right here --

A. Correct.

Q. -- that appear to be four E-mails that you gave me this morning; right?

A. Right. There's probably duplicates because there were different sequences.

MR. KOVACEV: I'll mark as Exhibit 3 a two-page document.

(GOV. EXHIBIT 3 MARKED FOR ID)

Q. So this is a two-page document, the first page --

MR. MARUSAK: Do you have copies for me?

MR. KOVACEV: Sorry.



Q. The first page has been marked as RAY LLC 007 A and contains a copy of a Post-it note?

A. Yes.

Q. The second page is RAY LLC 007?

A. Right.

Q. The Post-it note, is that your handwriting?

A. It is.

Q. You wrote that before you sent, you produced the documents in response to the subpoena?

A. That's correct.

Q. And on Page RAY LLC 007, is this the document that you've just been talking about?

A. It is.

Q. That correspondence between Attorney Sheehan and Jeff Rose?

A. It is.

MR. KOVACEV: I'll mark as, I guess it will be 4 through 7, the documents that you just introduced to me.

(GOV. EXHIBITS 4 - 7 MARKED FOR ID)

MR. KOVACEV: Exhibit 4 is a sheet with some E-mails. The first E-mail is dated July 9, 2005 from Harold Panciera to JTSheehan.

Exhibit 5 is a two-page document, the first page of which is an E-mail dated July 10, 2005,



from Harold Panciera to Jeff, standish9 at AOL.com.

Exhibit 6 is a two-page document, and the top E-mail is dated July 21, 2005, from Harold Panciera to JTSheehan.

And Exhibit 7 is what appears to be an Outlook address printout for Jeff Rose. Let's go off the record for a minute.

(OFF THE RECORD, 10:45 a.m. - 10:47 a.m.)

Q. Back on the record. I'll ask you to look first at Exhibit 4, and if you could just kind of explain the sequence of events?

A. It is a copy of an E-mail that was forwarded to me from Sheehan, and it is from Jeff Rose, it is signed Jeff. I've come to find out that this E-mail address, standish9, is him. He says that he couldn't open the file because it was in Word Perfect, Sheehan then forwarded it to me and said, I've attached the memo, could I prepare it and forward it to Jeff? And I said, Please forward his E-mail? And, in fact, I did, I typed it up in Word and E-mailed it to him.

Q. Looking at Exhibit 5?

A. This is a copy of the E-mail that I sent to Rose on Sunday, July 10th, and it is the memo that Sheehan prepared dated July 4th.

Q. There is Exhibit 6, tell me what happened next in the



sequence?

A. It is the continuation of the correspondence, apparently on Thursday the 14th, Jeff Rose corresponded with Sheehan saying everything was fine with the agreement, and then Sheehan sent me an E-mail tooting his horn, saying, "Do I do good work or what? As you can see, no cash to seller until the deal is done, what a great lawyer I am." Next E-mail is, "Enclosed is a draft for Narragansett," this is dated the 21st of June, "please give me your comments." I responded that day that, "It appears to reflect our agreement with Rose, let's move forward."

Q. What is the document that you're referring to?

A. These are copies of E-mails between myself and Sheehan.

Q. There is a reference to a draft agreement --

A. Yes.

Q. -- that you said was okay, is that the same document that is Exhibit 3, or is it different?

A. No, no, I'm sure that is the agreement with them. I'm guessing. I'm sure it is probably the agreement with Rose's entity.

Q. The agreement to do what?

A. I presume to go buy the property, or to buy the mortgage, I'm guessing.

Q. When he says, when Attorney Sheehan says, "As you can see, no cash to seller until the deal is done," what did you take that to mean?
A. It meant that it was going to be done on an installment sale, and, in fact, we would buy it predicated on the transaction being consummated after the IRS had their right, exercised their right of redemption. That was all my concern, and as I expressed earlier, we did not want to be at financial risk until the IRS had exercised their rights.
Q. So the mortgage was still Rose's mortgage, or the Rose entity's mortgage until such time as the IRS either had --
A. Well, the way it unfolded --
MR. MARUSAK: Objection.
A. -- the way it unfolded was that the mortgage was going to be assigned to our entity, and then our entity would foreclose on that mortgage, would exercise whatever rights were contained in that mortgage, but consideration for the mortgage would not be paid until the IRS had exhausted its right of redemption.
Q. At that time when you did the agreement with Jeff Rose or his entity about the assignment of the mortgage, were you expecting -- how were you expecting to pay -- first off, how much were you expecting to pay?



A. We were looking to pay, if you go back to my original notes, originally it was supposed to be $250,000. But it seems to me that we ended up paying more than that. We were going to pay for it -- again, keep in mind, when we came into this we were buying this as a speculative real estate acquisition, with the full intention of getting a mortgage, buying it, fixing it up, putting it on the market and making a profit, reselling it. That is what we intended to do. That was our objective. It wasn't until subsequently, subsequent to that that we were presented with an offer to buy the property, at which time we opted to sell the property rather than to go through the ordeal of, the ordeal of getting a mortgage, consummating the transaction, and fixing it up and being at risk to resell it.
Q. Ultimately the proceeds, as the deal happened, the proceeds that Raymond 25 --
A. Received.
Q. -- received from the sale to, I guess it was to the Beauchamps?
A. Right.
Q. Was that money or part of that money the consideration that was paid to Jeff Rose or his entity?
A. Yeah, it was, that was the consideration that was



paid to Jeff Rose. They came in, I'm sure they knew absolutely nothing about what was happening, the relationship with Rose, or whatever. And I do remember that they were insistent on the property being foreclosed legally and that the rights of redemption with the IRS were exhausted. But all of the money that they paid, it went, Sheehan actually ended up with the money. He walked away with the money and Sheehan cut checks. That is why we never had a checkbook, by the way. And if you get to the closing statement, you'll see where Coletti was reimbursed for money that he paid out-of-pocket for tax obligations. Sheehan was reimbursed, I think, for his legal expenditure, and I think we had a landscaping expense. But for that, everything was disbursed and we received a check.
Q. I was a little bit confused. I think you said you referred to "they" as in "they" were concerned about the IRS, who is "they"?
A. The Beachams (sic), the buyer, the buyer. I don't think it was any surprise to anyone that there was an IRS lien on the property. And they were -- their concern was that the property would be conveyed to them -- I'm not sure what the legal terminology was -- but with good title. And it was Sheehan's responsibility to work through those issues with



Beacham. Is it Beacham or Beauchamp?
MR. MARUSAK: Beauchamp.
A. Beauchamp, with the Beauchamps' attorneys.
Q. As far as you know, did the Beauchamps, or someone representing the Beauchamps in this transaction, know about the federal tax liens on the property in Narragansett?
MR. MARUSAK: Objection.
A. I can't speak with certainty that they knew. I knew they were concerned with getting good title on the property, but, the status of the -- I don't know, I can't really speak with certainty, it would be speculative for me.
Q. That is fine. Did you ever talk to someone, either the Beauchamps or someone representing the Beauchamps in that transaction, about the federal tax liens?
A. No, only met the Beauchamps once, and that was at the closing. Again, I wouldn't know them if they walked into the room.
Q. What was done to attempt to satisfy the Beauchamps that good title was conveyed?
A. There, again, if I knew the answer, I would willingly tell you. This is where I think Sheehan would have been a more appropriate person to be deposed, because he could certainly tell you what was

Page 30

done. I don't know. I honestly don't know.
(GOV. EXHIBIT 8 MARKED FOR ID)
MR. KOVACEV: Let's mark as Exhibit 8 a multipage document starting at RAY LLC 008 and ending at 17.
Q. If you'll take a look at that and let me know when you're ready.
(WITNESS PERUSING DOCUMENT)
A. Okay, I'm ready.
Q. I'm going to ask you first to look at the first three pages of Exhibit 8, which says Agreement as a title. Do you recognize that document and the first three pages?
A. Yes.
Q. What is it?
A. It is an agreement between Raymond 25 Associates and Kaleb Realty.
Q. Who is Kaleb Realty?
A. As I understand it, it's an entity owned by the Rose family, but beyond that, I don't know.
Q. Referring to the E-mail in Exhibit 6, where there is a draft agreement that you testified you were discussing?
A. Yes.
Q. Is this the agreement that was being referred to in the E-mails?

Page 31

A. I don't know. I couldn't specifically -- I would think it is. I would think that this is, I would think it probably is. I don't know for certain, but I would speculate that it is.
Q. The Agreement that is in Exhibit 8, if you turn to the third page, there is a signature under Raymond 25?
THE WITNESS: On the third page?
MR. KOVACEV: Yes.
Q. Is that your signature?
A. It is.
Q. Did you sign this agreement on behalf of Raymond 25 Associates, LLC?
A. I did.
Q. Above that there is a signature of V.M. Rose?
A. Yes.
Q. Who is that?
A. I presume that is Rose's father. He didn't sign this in my presence, that I can tell you. I'm presuming it is his father.
Q. Is this, this Agreement, Exhibit 8, is this the final Agreement that was executed between Raymond 25 and Kaleb Realty?
A. I believe it is, yes.
Q. If you look at the first page, almost halfway up from the bottom, there is a paragraph that says, "Whereas,

Page 32

assignee is a limited liability company"?
A. Yep.
Q. "Created on," blank, "2005"?
A. Right.
Q. Why is there a blank there?
A. I don't know. I honestly do not know. Other than Sheehan prepared the document, I do not know why it was blank.
Q. When did Raymond 25 Associates, LLC, actually come into existence?
A. That is a good question. The Articles of Organization were filed April 18, 2006.
Q. Had Raymond 25 Associates, LLC, existed in any form before those Articles of Organization were filed with the State of Rhode Island?
A. No.
MR. MARUSAK: Objection.
Q. As far as you know?
A. As far as I know, they did not, no.
Q. Just so we're clear, what was your position in Raymond 25?
A. Interesting.
Q. What did you say?
A. Interesting.
Q. What is interesting?

Page 33

A. Interesting that the entity was created after the Agreement was executed.
Q. Is that typical, in your experience?
A. No, it is not. It is not.
Q. What was your position in Raymond 25 Associates?
A. I was the managing member.
Q. Did anyone else have any positions, other than just a partner or member of the LLC?
A. No, no, we had three equal members, we all had an equal ownership interest. It's been my policy that if I'm involved in a project where I have the money at stake, that I like to at least have control over the entity to some degree in terms of operation. And that is usually more important at the back end of the project than it is on the front end of the project. So my concern as the managing member was to have control over the completion of the project, the rehabbing of the building, the selling of the building, et cetera.
Q. You were also the tax matters partner for federal income tax purposes?
A. That's correct.
Q. Who was supposed to take care of the corporate formalities?
A. Attorney Sheehan.
Q. So it was his responsibility, in your mind?

A. It was.
Q. As the managing member?
A. That's correct.
Q. That Attorney Sheehan would make sure --
A. That's correct, everything was done legally, and all legal obligations were fulfilled. That was his obligation.
Q. If you look back on Exhibit 8 on the first page, the Agreement?
A. Yes.
Q. The second Whereas clause mentions a note and mortgage in the principal sum of $52,000; do you see that?
A. Yes.
Q. From Nomar Realty Trust, what is your understanding of what Nomar Realty Trust is?
A. I do not know. I have no idea, other than I am under the impression it was part of the Rose dynasty.
Q. How did you get that impression?
A. From Sheehan.
Q. There is a reference to Borland Realty later on in that paragraph?
A. Yes.
Q. As the present owner of the property in Narragansett?
A. Yes.
Q. What do you know about Borland Realty?



A. The same as my knowledge of Nomar Realty, that it was part of the Rose -- and I'm being cynical by using the word dynasty, but part of the Rose family entities.
Q. Do you understand that Jeff Rose had a role in Borland Realty?
A. No. Did I know that he had a role in it?
MR. KOVACEV: Yes.
A. No, I knew nothing about Jeff Rose or his father or the entities.
Q. You're saying you don't know one way or the other?
A. No, that's correct. The only thing that, obviously, I think it mentions the participant in one of these documents, and he obviously has signed it.
MR. MARUSAK: Talking about signing what?
THE WITNESS: The Kaleb Realty partnership agreement.
MR. MARUSAK: Are you referring to the signature of J.V. Rose?
THE WITNESS: Yes.
Q. Let's orient ourselves in the document. Exhibit 8, Bates Number RAY LLC 012 Kaleb Realty Partnership Agreement?
A. Yes.
Q. Then you're looking at the signature page on RAY LLC 014?



A. Yes.
Q. And there is a signature, J.V. Rose?
A. Yes.
Q. Is it your understanding that is Jeff Rose's signature?
A. It is. I couldn't testify to that, but it is my, it is probably my presumption that it is.
Q. Do you know whether any payments were ever made before Raymond 25 acquired an interest in the note that is referred to in the Agreement in Exhibit 8, whether any payments had ever been made on that?
MR. MARUSAK: I object. I'm unclear. Payments by whom?
MR. KOVACEV: By anybody.
MR. MARUSAK: On the note?
MR. KOVACEV: On the note, before Raymond 25 Associates got involved.
A. I can tell you, I can only speak for myself. Definitely not. We, we paid nothing. I paid nothing.
MR. MARUSAK: Can I just ask, because I'm not -- I think I'm understanding your question one way, and I'm not sure that Mr. Panciera answered -- you were asking whether or not the note dated, looking at the note dated April 15, 1993. The question is whether or not anyone made any payments on those notes?
MR. KOVACEV: Right.



MR. MARUSAK: On that note from 1993 forward?
MR. KOVACEV: Yes.
THE WITNESS: As I said, I can only speak for myself, no.
MR. MARUSAK: So you're saying you did not make any payments --
THE WITNESS: Nor do I know --
MR. MARUSAK: -- not that you don't know?
THE WITNESS: No, I do not know of any payments. Both. I can be very specific.
MR. MARUSAK: Thank you.
Q. Do you know whether $52,000 was actually lent by Nomar Realty Trust to Borland Realty in 1993?
A. I don't know.
Q. Did anyone ever represent to you that that was the case?
A. Yes.
Q. Who?
A. By Sheehan, through the promissory note, and I was led to believe that, in fact, there was a filing on the property representing that $52,000.
Q. But other than the existence of the note or the mortgage?
A. I do not know, no knowledge.

Q. I take it there was a balance on the note in 2005 when you first became acquainted with this potential transaction; right?
A. Yes.
Q. Do you remember what the price was?
A. I was told, I don't know with a degree of certainty, but I think it was like 300 some-odd-thousand dollars, 330,000, maybe. Something close to that. It might have even been more than that. I'm looking at this, your Exhibit 011.
Q. Bates Number RAY LLC 011?
A. Yeah.
Q. Where did this come from?
A. Sheehan.
Q. What was it supposed to represent?
A. I think the value of the $52,000 with accumulated interest from the beginning of the note in 1993, until midyear August of 2005.
Q. Looking at this for a minute, can you tell me, if you understand, if you could explain this to me. There is a column that says Savings/Rate?
A. Yes.
Q. Do you have any understanding what that means?
A. No, I don't.
Q. Then if you look under Savings, I guess it is the



second row down, it says, the first column says $0, do you see that?
THE WITNESS: In the first column?
MR. KOVACEV: Yes.
THE WITNESS: Under Savings/Rate?
MR. KOVACEV: Yes.
A. Yes.
Q. Then you go one, two, three, four columns over, there is a figure, $398,987.55?
A. Yes.
Q. That is under 16.75 percent?
A. Yes.
Q. Do you understand what that represents?
A. I'm surmising, if you go up on the right-hand side, that it is the future value of the $52,000.
Q. When you say future value, what do you mean by that?
A. If someone were to take, would have put $52,000 into a savings account at compounded interest of 16.75 percent, for that period of time, 12 years, that it would be worth $398,997.55.
Q. If you could look at the first page of Exhibit 8?
A. Yes.
Q. At the very bottom there is a Paragraph Number 1?
A. Yep. That's it. That's the amount.
Q. That is the amount, that is the amount referenced?



A. That is what was represented in this Agreement, yes.
Q. So that is also the amount that is represented as the outstanding balance of the mortgage at that time?
A. Yes.
Q. If you turn to the next page, the second page of the Exhibit 8, and there is a Paragraph Number 4?
A. Okay.
Q. This says, among other things, "The assignee will pay the assignor the sum of $250,000," do you see that?
A. Yes.
Q. How was that figure arrived at, $250,000?
A. Sheehan negotiated it.
Q. Did you have any input --
A. No.
Q. -- into that amount?
A. No. That was, I was told, the asking price. That kind of goes back to my notes of, my chronology, that 250,000 was in early June of 2005.
Q. Referring to Exhibit 2?
A. Yeah. That was the amount.
Q. There are some subparagraphs -- did you have something else?
A. No, I was going to say for E, corroborates what I had mentioned earlier about the election of the



Internal Revenue not to redeem the premises during the applicable period provided by statute.
Q. I would like to ask you about the Subparagraphs A through E under Number 4. What did you understand those to be?
A. Verification of the -- you want me to address them individually?
Q. Yes, let's start with A?
A. My interpretation is they are making representations in this assignment agreement and that it was a condition of the agreement that they be verified.
Q. Did anyone do any verification of those representations?
A. Again, that would have been Sheehan, it was not me.
Q. Did Attorney Sheehan tell you they had been verified, those representations?
A. I don't remember him specifically saying that they had been verified.
Q. The representations that he would have to verify, would that include whether there was a bona fide mortgage and note on the property?
A. Yes.
Q. Whether, in fact, the amount that was owed was 398?
A. That it was verified, yes.

to you -- copies of the certified letters and the receipts.
Q. I think we're still on Exhibit 9.
A. Is this the --
Q. The big one starting at Page 164, and I guess ending at 167?
A. Yes.
Q. Is that your understanding from Attorney Sheehan of what was sent to the IRS?
A. It is. He in fact, provided these to me two weeks ago, or maybe a bit longer, I'm not sure. I think I faxed them to you within a day or two of my receiving them.
Q. Are you aware of any other notices that were sent to the IRS regarding foreclosure?
A. I'm not.
Q. Other than the deal with 25 Raymond Drive, have you ever worked with any of the Roses?
A. No.
Q. Can you go back to Exhibit 8 for a moment?
A. Sure.
Q. Back to Paragraph 4, Subparagraph D on the second page?
A. Okay.
Q. Acquisition of the Security By the Assignee After Foreclosure, what is your understanding what that



means?
A. I don't know. Would you like my liberal interpretation of it?
MR. KOVACEV: I'll take it.
A. That after the foreclosure we would be, we would receive some security, acquisition of the security by the assigned -- pardon me, by the, yeah, the assignee would be us after the foreclosure.
Q. What kind of security?
A. I don't know.
Q. Did that actually happen?
A. I don't know.
Q. In 4 E, election by the Internal Revenue Service not to redeem the premises during the applicable period provided by statute; do you see that?
A. Yes. I understand, I know what that is.
Q. What is your understanding as to why that was part of the agreement?
A. Because there were tax liens on the property, you know, there were known federal tax liens on the property. And the Internal Revenue Service had the right to redeem the property for the value of the tax obligation and/or they had the right to turn away from it. And this was included to assure us of our obligations or not in the event the IRS decided to



redeem the property.
Q. What was your understanding what would happen under this agreement if the IRS did, indeed, act to redeem?
A. They would take title to the property, our agreement would be null and void, and we would walk away.
Q. When you say walk away, what do you mean by that?
A. We would walk away from the transaction.
Q. Would you?
A. I mean, I would imagine, because I'm not sure if we had title to the property that we would have to title the property back to the IRS. I'm not sure actually what the legal ramifications would be. I can just give you kind of the macro perspective as I had from the very get-go.
There were known tax liens on the property, we were buying a piece of property that had been unoccupied, was in deplorable shape for a competitive price, we were going to spend the money to fix it up, resell it, and hopefully make a profit. We knew that there were tax liens on the property. My caveat from the very get-go was we don't spend any money until the IRS has exercised their right of redemption, or not. And if they haven't and they walk away from the property, we consummate the transaction.



That was it.
This was my understanding, that if, in fact, they exercised their right of redemption, that we walk away from the property, whatever was involved or necessary to do that, whether it was conveying the property to the IRS or whatever, would be done in a legal fashion.
Q. At that point, at that point was it your understanding that Raymond 25 Associates would have spent any money on the deal, at that point, before the IRS had the opportunity to redeem or not?
A. The only money we would have expended would have been the out-of-pocket for the property tax issues and the gardening issues. So we would have been out-of-pocket for, you know, probably something under $10,000, which we would have each had the responsibility of absorbing.
Q. So, the purpose for this business purchase, from your perspective, was to make sure that there was no financial risk to Raymond 25 in case the IRS decided to redeem?
A. That's correct.
Q. It was your understanding that this agreement accomplished that?
A. Yes.

Q. Looking at Paragraph 6 on the same page, in the Agreement that is Exhibit 8, "Full payment shall be made to the assignor within five days after the expiration of 120 days from the date of foreclosure," and what was the purpose of that?
A. Because it was explained to me that that was the statutory period that the IRS had to redeem the property, and once that had expired, then our obligation was to consummate the transaction and pay the consideration.
Q. So it was your understanding under the structure of this deal that if the IRS had acted to redeem the property, Raymond 25 Associates would not have put any money --
A. Beyond what we had already spent, that is correct.
Q. Not paid $250,000?
A. That's right, that's exactly right.
Q. Paragraph 7 on the same page, what was your understanding of what the purpose of that provision was?
A. It just reaffirms what I've just communicated, that if, in fact, the IRS and/or state or other entity intervened and challenged any aspect of the foreclosure or the validity of the note or the mortgage, that we had the right to terminate the agreement.



Q. What would happen, what is your understanding what would happen?
A. We would walk away, terminate the agreement and that was the end of it. Whatever out-of-pocket expenditures we had incurred, we would absorb.
Q. As far as the $250,000, what would happen to that?
A. Nothing. We would not have paid it, obviously.
Q. Looking at Paragraph 8 on Number 8, the same page, this is a reference to a simultaneous assignment of the membership interests in Raymond 25 Associates. What was your understanding of that provision?
A. That we were assigning, or at least agreed to assign the interest we had in Raymond 25 Associates to the assignor as collateral for the assignment of the mortgage to us.
Q. Do you have any understanding why that provision was put in the agreement?
A. No, I do not, other than, I can surmise. I don't know, again, this is something that Sheehan crafted, I can only surmise that it was to provide collateral or security or a level of comfort to the assignor.
Q. Was anything ever filed, a UCC warning statement or any other filing made regarding that security interest?
A. I do not remember anything filed.
MR. KOVACEV: We've been going for a



little over an hour. Why don't we take a break.
MR. MARUSAK: Fair enough.
(BRIEF RECESS, 11:40 a.m. - 11:53 a.m.)
Q. Back on the record. Mr. Panciera, I would like to turn back to what has been marked as Exhibit 3. I would like you to look particularly at the last paragraph?
A. Page 1?
Q. The second page, 007, the actual document. The paragraph that starts with, "In the above matter, all are protected"?
A. Right.
Q. Do you have any understanding what Attorney Sheehan is talking about in this paragraph?
A. Well, my literal interpretation is that we would go through the expense and effort of the foreclosure, I have no idea what he's referring to about, "Your father's side is secured for the purchase price pending the 120-day time period and the deal is done. In the event the IRS rears its head in any significant degree, files a court challenge, we either fight, negotiate with them or collapse our tents and go home." I think, surmising, he's outlining that we would bear the associated cost of foreclosing on the property, don't know what he's referring to about his father's side, but I'm presuming that is the one who was the assignor,



and that the IRS has 120 days to either move forward with their lien under the right of redemption or not. And if, in fact, they do, that his options are: File a court challenge, negotiate with them, or collapse our tents and go home. I'm not sure if he's talking to them as a client or he's intimating what our entity would do. But he knows clearly what our position was.
Q. Going up a couple of paragraphs to the paragraph that is Number 2?
A. Okay.
Q. It says sale price of the note and mortgage is $250,000?
A. Yes.
Q. I think I asked you this, but because it kind of orients us as to a date, July 4, 2005, was this the first indication that you had that the sale price for the mortgage note would be $250,000, or is that something you knew before this time?
A. I think in my chronology, it seems to me that addressed that. I put in early June, 2005. That is when I knew the price, Sheehan had suggested the price of 250,000. Of course, this was supposedly written on July 4th.
Q. Looking at Paragraph 3, there is a reference to Raymond 25 presenting a first bid for the property with

Page 66

that E-mail, the one that starts with, "The foreclosure deed is a little suspect." If you read that paragraph, do you remember any discussion you had with anybody representing the Beauchamps about that issue?
A. No, and I did not, I had no conversations with them, Sheehan had all of the applicable conversations with their attorney.
Q. Do you know what those conversations were?
A. I don't.
Q. Looking at Paragraph 6?
A. Yes.
Q. There is some handwriting after that, do you know whose handwriting that is?
A. I don't.
Q. Paragraph 6, again, there is a reference to still being in the redemption period. Do you have any understanding why that is an issue, or why that was an issue?
A. I don't.
Q. At some point there was a closing of the sale of the property to Beauchamps?
A. Yes.
Q. Did you attend that?
A. No. Pardon me, I did, I did.
Q. Who else was there?

Page 67

A. Attorney Sheehan, one of the Beauchamps, and their attorney, and we did it in their office up in Woonsocket, maybe -- does that sound right? Cumberland.
Q. The sale proceeds, were they given at the closing?
A. I'm not sure. I honestly don't know. They were either given at the closing or soon thereafter to Sheehan. Sheehan got the proceeds, put it into his account, and he cut the checks.
Q. When you say cut the checks, what checks?
A. Cut the checks to myself, Don Coletti, to himself, and I only can presume paid off the Rose family.
Q. Do you remember about how much you got? It's in the document, I know.
A. 20,000, give or take.
MR. MARUSAK: Excuse me. Can you read back the last question and answer?
(PAGE 67, LINES 12 - 14 READ BY REPORTER)
Q. About how much money did you personally put into this transaction?
A. Nothing.
Q. Do you know what account Attorney Sheehan put the money that was the proceeds of the sale from the Beauchamps into?
A. I don't know.

Page 68

Q. Do you know whether -- you said there was no Raymond 25 Associates' bank account?
A. There was not.
Q. Do you remember the check that you got?
A. Yeah, I don't remember what it was. I mean, I imagine I could probably get a copy of it from the bank, I would imagine they have a photocopy of it, but I don't remember what account it was from.
Q. I don't recall that being in the documents that you produced?
A. Yeah, I don't have it. I would have to go to the bank to obtain it.
Q. Sitting here today, you don't remember what institution it was drawn from?
A. No.
Q. Or whose account?
A. I do not.
MR. KOVACEV: Let's mark this as Exhibit 14, a four-page document starting at RAY LLC 118.
(GOV. EXHIBIT 14 MARKED FOR ID)
(WITNESS PERUSING DOCUMENT)
A. Interesting. That's interesting.
Q. Do you recognize this document?
A. I do.

Page 69

Q. What is it?
A. The first page is a fax memo that I sent to Matt West, who is the attorney who prepared our tax return -- pardon me, the accountant who prepared our tax return, and I tried to outline what had happened. Do you want me to continue on with the other pages?
MR. KOVACEV: Please.
A. The next page is a memo that I sent to Don Coletti and John Sheehan discussing a spreadsheet which I had enclosed which detailed all of the money coming in, the expenditures and what was to be provided. Interestingly, the last sentence of this says, "Don will cut appropriate checks to each of us." Which, I don't remember that as being the case, but, I just don't remember that. I'm a little bit surprised at that.
The other is a spreadsheet which showed the sales price, expenditures, and how much was paid to each party. And the last page, let's see, Don Coletti's acknowledgment to me that everything looked okay on the statement and he was paying a check for $8,250 to Executive Real Estate as their commission.
Q. So, it's to your recollection that Attorney Sheehan is the one who received --
A. Sheehan is the one who got the check from the

CERTIFICATE

I, Melanie M. Chace, a Notary Public in and for the State of Rhode Island and Providence Plantations, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of HAROLD PANCIERA, JR., in the above-entitled cause, was taken before me on behalf of the Government, at the offices of UNITED STATES ATTORNEY'S OFFICE, Fleet Center, 50 Kennedy Plaza, 8th Floor, Providence, Rhode Island, on March 11, 2008, at 10:00 a.m. That previous to examination of said witness, who was of lawful age, was first sworn by me and duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth, and that thereupon testified as in the foregoing manner as set out in the aforesaid transcript.

I further certify that the foregoing deposition was taken down by me in machine shorthand and was later transcribed by computer and that the foregoing deposition is a true and accurate record of the testimony of said witness.

Pursuant to Rule 5 (d) and 30 (f) of the Federal Rules of Civil Procedure, original transcripts shall not be filed in court; therefore, the original is delivered and retained by Government Attorney, Robert Kovacev.

I have enclosed with the deposition a correction and signature page, which must be signed before a Notary Public.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of March, 2008.

MELANIE CHACE, RPR, NOTARY PUBLIC
MY COMMISSION EXPIRES APRIL 7, 2011