UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA :
:
VS. :C.A.NO.1:07CV211S
:
KEITH BEAUCHAMP, et al :

Deposition of JOHN T. SHEEHAN taken on behalf of the Government on Wednesday, July 9, 2008, at the United States Attorney's Office, Fleet Center, 50 Kennedy Plaza, 8th Floor, Providence, Rhode Island, commencing at 11:15 a.m. before Jane M. Callaghan, a duly commissioned Notary Public within and for the State of Rhode Island and Providence Plantations.

APPEARANCES

U. S. DEPARTMENT OF JUSTICE
BY: ROBERT J. KOVACEV, ESQ. ..........FOR GOVERNMENT

GIDLEY, SARLI & MARUSAK
BY: JAMES P. MARUSAK, ESQ. ...........FOR DEFENDANTS

JAMES L. O'NEILL, ESQ. ...............FOR DEPONENT

COPY



GOVERNMENT EXHIBIT
C

# I N D E X


| DEPONENT | PAGE |
|---|---|
| JOHN T. SHEEHAN | |
| EXAMINATION BY MR. KOVACEV ............. | 3 |
| EXAMINATION BY MR. MARUSAK ............. | 108 |


## E X H I B I T


| FOR THE GOVERNMENT | (FOR ID) |
|---|---|
| #50 Copy of Subpoena ........................ | 3 |

Marked Question:
Page 7, Line 13

WEDNESDAY, JULY 9, 2008

(COMMENCING AT 11:15 A.M.)

(Copy of Subpoena to John T. Sheehan marked Government Exhibit No. 50 for identification)

JOHN T. SHEEHAN, having been duly sworn by Notary Public, testified as follows:

EXAMINATION BY MR. KOVACEV

Q Good morning, Mr. Sheehan.
A Good morning.
Q My name is Rob Kovacev, I'm a trial attorney with the civil trial section of the Tax Division of the United States Department of Justice, and you've been served with a Subpoena in the civil case United States versus Beauchamp, correct?
A That's correct.
Q And you're here pursuant to that Subpoena?
A Yes.
Q Have you ever been deposed before?
A Yes.
Q How many times?
A Three, approximately.
Q So, you probably are generally familiar with how this works, but let me just briefly explain it to you. I'll be asking questions and you'll be

answering them. A couple of things I would ask, if I ask you a question and it's vague, or you'd like some clarification, please, let me know so that I can make the question clearer for you, just so that we can get it accomplished that we can get the best questions and answers today, can you do that for me?

A I can.

Q If you need to take a break, go to the restroom, need to confer with your attorney, let me know, I'll be happy to accommodate you. The only thing I do ask, if there is a question pending, if you could answer the question first, unless there's some privilege concern you want to talk to your lawyer about, answer the question first, then we can take the restroom break, is that all right?

A That's correct. That's fine.

Q Any reason why we can't start now?

A No.

Q Mr. Sheehan, where do you live?

A Newport, Rhode Island.

Q Is there an address?

A 10 Green Lane.

Q And how long have you been at 10 Green Lane?

A About five months.

Q And where were you before that?

A 34 Bayside Avenue in Newport.
Q Where do you work?
A I work out of my house, basically.
Q And what is it that you do for a living?
A I'm an attorney, I invest in real estate, those are the basically two things that I do.
Q So, are you licensed with the Rhode Island bar?
A I am.
Q Any other bars?
A No.
Q And how long have you practiced as an attorney?
A Since 1972.
Q You say invest in real estate; can you kind of describe what kind of real estate investment activity that you do.
A Not much recently, but now and then a house may come along, looks like a good bargain, I might buy it, renovate it, sell it.
Q Have you done that often?
A Occasionally.
Q How many times in the past decade?
A Twenty, twenty-five.
Q Do you do those as a sole investor or in conjunction with other investors?
A Usually solo.

Q Have you ever done it along with other people?
A On occasion, yes.
Q In the past ten years, who are the people that you've joined in real estate investment deals with?
MR. O'NEILL: If I might voice an objection at this stage, it's rather broad, I mean, past ten years?
MR. KOVACEV: Yeah, that was the question. You can answer it.
A Ben Cerilli, Danny Chow, C-H-O-W --
MR. O'NEILL: I'm going to instruct Mr. Sheehan that if any of these individuals whose names you're seeking are individuals with whom he had an attorney-client relationship, that he is going to assert that privilege at this juncture. Having asked the question the last ten years, I don't know as we are prepared to identify which individuals were clients and which individuals are simply investors, and there would be a distinction there.
MR. KOVACEV: Just so I'm clear, your instruction is if Mr. Sheehan participated as an investor in a deal with someone who also happened to be a client, then, the client's identity is privileged?

MR. O'NEILL: No, no, it would have to be an attorney-client. There would have to be -- we both recognize an attorney-client relationship. I'm not instructing him to assert the privilege by sheer virtue of the fact that one of the other investors happened to be an attorney, but I want to remind Mr. Sheehan that if any of these individuals are individuals with whom he had an attorney-client relationship at the time that they were investors, then, there would have to be a distinction made between their relationship as investors and their relationship as clients.

Q To the extent that someone is also a client of yours as an attorney, but is also, you know, a business partner in a real estate venture, I'd like you to identify them as a business partner. Okay, do you understand my question?

A Yeah, but they're all clients as well, and during the period that I would be doing an investment with them, I was also representing them as clients --

Q That's fine.

A (Continued) -- as far as pretty much everyone that I can think of that I may have done some real estate transaction with, and as to those individuals, I would invoke the attorney-client privilege.

MR. KOVACEV: I will note for the record that the identity of a client and an attorney-client relationship is not properly privileged and I'll ask the reporter to mark that question.

MR. MARUSAK: Can I interject, I wasn't sure if Mr. O'Neill was instructing him not to answer or to give the names of those who were both clients and partners. Can we, at least, clarify that, because I wasn't sure that that was what he said. I think what he was saying, at least the way I interpreted what Mr. O'Neill was saying, was that if it got into an area that concerned attorney-client communications, that that was what he was asserting, maybe I'm wrong.

MR. O'NEILL: That's correct, if it gets into the substance of the relationship, or questions concerning the actual relationship, or matters pertaining to the relationship, that, then, we're asserting a privilege.

Q Just so we're all clear --

MR. O'NEILL: For instance, I didn't mean to interrupt, for instance he identified one client -- well, one investor, with whom he has participated in real estate projects as Ben Cerilli,

who happens to be an attorney himself, so that he's prepared to identify individuals, just not any relationship with the individuals.
Q I'm just asking for the names of individuals that you've done real estate dealings with.
A Okay.
Q Are you prepared to answer that question?
A As best I can.
Q Okay, and would it help if I limited it to the past five years?
A Probably.
Q Let's do that then, past five years.
A Well, Harold Panciera, P-A-N-C-I-E-R-A; Donald Coletti, C-O-L-E-T-T-I; James Connell; George Bolton; Rick Wessels, W-E-S-S-E-L-S; Richard Fisher, F-I-S-H-E-R; Ronald Levesque, L-E-V-E-S-Q-U-E; George Smith; Dan Hyman, H-Y-M-A-N; that would be it, best of my recollection.
Q First person that you mentioned, Harold Panciera --
A Yes.
Q (Continued) -- how many real estate deals have you done with Mr. Panciera, again as an investor?
A One.
Q And what kind of property was that?
A It was a house in Narragansett.

Q Do you remember the address?
A Raymond Drive, I don't remember the address.
Q Was there anyone else involved in that particular business deal for the Raymond Drive property?
A Donald Coletti.
Q Anyone else?
A No.
Q Talking about the Raymond Drive property, when did you first get involved in a potential real estate investment involving the Raymond Drive property?
MR. O'NEILL: Do you have the date?
A I don't have a date, several years ago. I don't have a date.
Q Do you have a year?
A No, I honestly don't. I just --
Q Do you remember whether it was --
A In the last two or three years.
Q I appreciate that.
A Probably three years ago, but about three years, maybe four.
Q How did you hear about a potential real estate investment opportunity that involved Raymond Drive?
A Probably from a client, probably Victor Rose.
Q Is it Viriato Rose?
A Yes.

Q People call him --
A Victor.
Q And do you remember when that communication -- when you first learned of a potential investment opportunity on the Raymond Drive property happened?
A It was a legal matter that he called me on concerning the house.
Q I asked when it happened.
A Probably the same time, three years ago.
Q So, you've identified Victor Rose as a client?
A Yes.
Q Is that right?
A Yes, he is.
Q Is Mr. Panciera a client of yours?
A He was.
Q How about Mr. Coletti?
A He was not. Strike that. He was.
Q With respect to the investment on the Raymond Drive property, what was the nature of your investment by which -- I mean, first -- let me break that down. First, did you infuse any capital in order to take advantage of the investment?
A We're getting to a point where it's getting to be attorney-client.
Q I'm asking about the business deal.

A The business deal is interrelated with the legal deal, they're one in the same.
Q Your lawyer's not giving you an instruction, are you asserting that attorney client-privilege?
A I am, I am.
Q Mr. Sheehan, did you get any return on your investment in the Raymond Drive property?
A Yes.
Q How much?
A I don't recall.
Q What order of magnitude?
A Fifteen thousand, in that range.
Q And were those -- and that was a return on the investment as opposed to legal fees?
A They may have been intertwined.
Q Was there an entity that was used to facilitate the Raymond Drive business deal?
A It was called Raymond 25 Associates, LLC.
Q And were you a member of Raymond 25 Associates?
A Yes.
Q And Mr. Panciera and Mr. Coletti were also members?
A Yes.
Q And Mr. Panciera was the manager of the LLC?
A Yes.
Q Let me ask it this way. Who actually set up the

Raymond 25 Associates, LLC entity, who prepared the
paperwork, et cetera?
A Either Harold Panciera or myself. I don't recall.
Q Did you invite Mr. Panciera to join in a potential
business deal involving Raymond Drive at some point?
A Yes.
Q It was then the same time frame then, about three
years ago?
A Same time frame.
Q How did that invitation take place, was it a
face-to-face meeting?
A I don't recall.
Q Why did you invite Mr. Panciera to become part of
Raymond 25 Associates?
A He was a friend, had a good credit score.
Q Any other reason?
A No.
Q Why was Mr. Panciera having a good credit score
relevant?
A In the event we needed financing.
Q Did Raymond 25 Associates ever seek financing with
respect to Raymond Drive?
A No.
Q How about Mr. Coletti, how is it that Mr. Coletti
became a member of the LLC?

A Harold Panciera invited him.
Q Do you know why?
A He's a real estate broker.
Q I think -- did Mr. Panciera invest any capital into Raymond 25 Associates?
A That would be attorney-client privilege.
Q You did not receive an instruction to that effect, are you asserting that on your own?
A Yes, I'm asserting that.
Q How about Mr. Coletti, how much capital did Mr. Coletti infuse?
A Same objection.
Q You're refusing to answer on the grounds of claiming the attorney-client privilege?
A Attorney-client.

MR. MARUSAK: Can I interject, I had written down in my notes the first question was whether Coletti, was that wrong?

MR. KOVACEV: Off the record.

(Off The Record Colloquy)

Q Do you consider Raymond 25 Associates to have been a client of yours?
A I do.
Q What percentage membership in Raymond 25 Associates did you have?

A That's privileged as well.
MR. MARUSAK: I'm sorry, would you be good enough to repeat that question.
(Previous question read by reporter)
A (Continued) My response is the same, that's privileged.
MR. O'NEILL: What percentage did Mr. Sheehan have in it?
MR. KOVACEV: Yes.
MR. O'NEILL: Can I just take a minute, please.
MR. KOVACEV: Sure.
(PAUSE)
A (Continued) I will respond. One-third.
Q And now at some point did Raymond 25 Associates obtain an interest in the Raymond Drive property?
A Yes.
Q How was that accomplished?
A By a foreclosure.
Q Was the foreclosure on a mortgage instrument?
A It was a mortgage on the property, that's correct.
Q And who actually made the mortgage that was ultimately foreclosed upon by Raymond 25 Associates?
A It was an old mortgage, I think Borland Realty owned

the property fifteen years ago, and I think at the time they obtained the mortgage from an entity, it was either Nomar Realty or Kaleb Realty, I'm not sure which one, Kaleb Realty, and we received it at a later date, three years ago.
Q When you say "we received," who's "we?"
A Raymond 25 Associates.
Q And from whom did Raymond 25 Associates receive the mortgage?
A Victor Rose.
Q Victor Rose acting individually or through an entity?
A Through the mortgage holder, either Nomar or Kaleb, I just don't recall which one it was at the time. One was the owner, either Kaleb or Nomar, and one was the mortgage grantor, either Kaleb or Nomar, I'm not sure which one is which.
Q What kind of entity is Kaleb Realty?
A It's a partnership.
Q Who are the partners?
A I believe Victor Rose and his wife, I believe.
Q Any others?
A Not to my knowledge.
Q When was Kaleb Realty established?
A I don't know.

Q How about Nomar?
A I don't know when that was established.
Q Do you know what kind of entity Nomar was?
A I think it was a partnership.
Q And who were the partners?
A I don't know.
Q Why did -- let me ask it this way. How did Raymond 25 Associates acquire a mortgage from -- I'll represent to you I had it from Kaleb Realty, that's the person who held the mortgage at the time.
A Okay, yeah.
Q How was that structured?
A An assignment of mortgage.
Q And that was an assignment of the mortgage from --
A Held by Kaleb. Kaleb was the mortgage holder, I just wasn't sure which one it was.
Q And what was the consideration for the assignment?
A That's attorney-client privilege.
Q What's your basis of your claim for attorney-client privilege on the consideration for the assignment of the mortgage?
MR. O'NEILL: Objection.
MR. KOVACEV: You can answer.
A That there were negotiations and the consideration was discussed and agreed.

Q Negotiations between who?
A Myself and Victor Rose.
Q And in those negotiations, who were you representing?
A I'm not sure whether Raymond 25 was set up at the time. It may have been Harold Panciera, I don't know. It was either Harold Panciera, Don Coletti, Raymond 25 and myself and Mr. Rose as a client as well on other, and I was probably handling that as well. So, I would say they're all clients.
Q So, you're saying that you were negotiating the assignment of the mortgage from Kaleb Realty to Raymond 25 Associates and with Victor Rose and Victor Rose was your client and it's Raymond 25 Associates or Panciera and Coletti were your clients as well in the same transaction, is that what you're saying?
A That's right.
Q These negotiations, did they take place face to face?
A Some did.
Q Where did they take place, the face-to-face negotiations between you and Vic Rose?
A Coffee shop in Barrington, one did, and telephone calls.

Q And you said there were telephone calls as well between you --
A Victor Rose.
MR. KOVACEV: Vic, okay.
Q And what was discussed in the various discussions you had with Mr. Rose that were negotiations of the assignment of the mortgage?
A That would be attorney-client.
Q Which client are you asserting privilege for?
A Well, myself, Panciera, Vic Rose and Coletti.
Q Any others?
A And Raymond 25, if it was created at the time. I don't know the date of creation of Raymond 25, so that would be the client as well.
Q Was the assignment of mortgage memorialized in a written agreement?
A Yes.
Q Was any money paid from -- was any money paid to Kaleb Realty as a result of the assignment agreement?
A I would say that's attorney-client as well.
Q Who's the client? On whose behalf are you asserting that privilege?
A Vic Rose doing business as Kaleb Realty.
Q Any other clients?

A Well, again, I was representing everyone, so I would at least say for the purpose of this that the other persons were my clients as well, Raymond 25, Panciera and Coletti.

Q After the foreclosure that you referenced earlier on the Raymond Drive property, what did Raymond 25 Associates do with the property?

A We sold it.

Q To whom?

A Well, either to an individual named Keith Beauchamp or an entity that Keith Beauchamp was involved with, I don't recall, but that's who the property was sold to, Beauchamp.

Q Are you referring -- you referred to some papers there, are those --

A I was looking for a name.

Q Are those notes that you prepared?

A Some notes.

Q Did your attorney instruct you to prepare those notes?

A They were prepared during conferences with my attorney, that's correct.

Q Were there any papers there that were not notes that you prepared during conferences with your attorney?

A Yeah, your Subpoena.

Q Anything else?
A I was looking for the name of the Plaintiff in the case which is attached to the Subpoena, two copies of the Subpoena actually.
MR. MARUSAK: I assume when you said the Plaintiff in the case, you meant the Defendant?
THE WITNESS: Oh, I'm sorry, yeah. I'm sorry, the Defendant.
Q What was your role in the transaction involving selling the Raymond Drive property to the Beauchamps?
A I was the attorney.
Q For who?
A Raymond 25.
Q Were you also a member of Raymond 25 at the time?
A I was.
Q How much did the property sell for when it was sold to the Beauchamps?
A I don't recall.
Q Do you recall, like in an order of magnitude?
A Two hundred, the high two hundreds, I think.
Q And how was that money paid physically, how was it paid, check, wire transfer, cash?
A I don't know, I didn't handle that.

Q Who did?
A Harold Panciera.
Q So, it's your testimony that Mr. Panciera received the proceeds of the sale from --
A Your question was?
Q (Continued) -- Beauchamp?
A Who received the proceeds at the time of the sale?
Q That's what I mean.
A Harold Panciera.
Q Did you ever receive the proceeds of the sale of Raymond Drive?
A Let me, I don't recall whether it was, probably was Harold Panciera, 'cause he was the manager/ bookkeeper, he probably received the proceeds from the Beauchamps.
Q Did the proceeds ever come to you?
A Yes.
Q All the proceeds or just a portion of the proceeds?
A A portion of the proceeds, I believe.
Q What portion of the proceeds came to you?
A I don't recall. I don't recall whether Harold Panciera gave me a check or whether, in fact, I had received the proceeds. I think Harold received the proceeds. I just don't recall, but a portion came to me.

Q Is that the fifteen thousand, approximately, that you testified about earlier?
A That and other proceeds from the sale.
Q What other proceeds from the sale?
A That would be attorney-client.
Q Just so I'm clear, that the amount of money that you received as proceeds from the sale you're asserting your attorney-client privilege?
A I am, I am.
Q Who's the client?
A Kaleb Realty, Victor Rose.
Q So, the money that you received from Mr. Panciera is privileged as a result of your attorney-client relationship with Vic Rose, is that your testimony?
A Yes.
Q When you received the additional proceeds, apart from the fifteen thousand that you testified about earlier, what did you do with those proceeds?
A That's attorney-client privilege.
Q Did those proceeds go to Vic Rose?
A Attorney-client privilege.
Q Did they go to Jeffrey Rose?
A Attorney-client privilege.
Q Did they go to an entity that's affiliated with either Victor or Jeffrey Rose or both?

A Attorney-client privilege.
Q Who's the client on whose benefit you're asserting that privilege?
A Kaleb Realty.
Q You've been retained by Kaleb Realty?
A I have in the past, yes.
Q And when were you first retained by Kaleb Realty?
A Over the course of several years I have been asked questions about Kaleb Realty from Victor Rose and I responded to his questions about Kaleb Realty. During the course of titles that had been done, I would discuss Kaleb Realty with him.
Q Have you ever discussed Kaleb Realty with Jeff Rose?
A Yes.
Q Is Jeff Rose a client of yours?
A Yes, he is.
Q Is he currently a client?
A There are pending cases, yes, he is.
Q Pending cases in which you're representing him?
A Yes.
Q What is the nature of the legal services that you provide, are they litigation, tax planning, real estate?
A Real estate, family, including Jeff Rose, his father and his son, most family members, have a variety of

real estate transactions.
Q When was the last time that you had a communication with Jeff Rose?
A Eight months ago.
Q What kind of communication was it, voice, e-mail, in person?
A Email.
Q Have you had contact with him in the past, say, three years by any means, other than e-mail?
A Telephone.
Q Did he call you or did you call him?
A Both.
Q What was the phone number at which you called him?
A It was -- I don't have it with me.
Q But you do have it somewhere?
A I do.
Q Any other means besides e-mail and telephone conversations you have communicated with Jeffrey Rose in the past three years?
A No.
Q What is the e-mail address that you use when you're contacting Jeffrey Rose?
MR. O'NEILL: Did you ask what his e-mail address is?
MR. KOVACEV: What Jeffrey Rose's

e-mail address is.

A Privileged.

Q So the e-mail address that Jeffrey Rose uses is, in your view, privileged?

A It's an e-mail that he used to contact me, whether it's a public e-mail address I don't know. So, in a context of that, I have to assert the privilege, not knowing whether it's an e-mail from me, an address that he uses for me or just a general address, I don't know.

Q Has Jeffrey Rose's e-mail address itself contained -- identify a legal advice, request for legal advice?

A I'm sorry repeat that.

(Pending question read by reporter)

MR. O'NEILL: I object to the question. That's something you want to litigate later on. Right now we're going to assert the privilege with respect to what appears to be your questions to identify his e-mail address, other particulars that have been shared with Mr. Sheehan in his capacity as Rose's attorney, Jeffrey Rose's attorney.

MR. KOVACEV: Just so I understand your instruction, your instruction is that an e-mail

address by which Jeffrey Rose communicates with Mr. Sheehan is privileged information, is that your instruction to the witness?

MR. O'NEILL: At this juncture that's correct.

Q Are you going to abide by that instruction?

A I am.

Q Have you had any communications with Jeffrey Rose regarding the Raymond Drive property?

A No.

Q None at all?

A No.

Q Have you asked anyone to --

A Strike that. Read the question again.

(Previous question read by reporter)

A (Continued) Yes.

Q How many times have you communicated with Jeffrey Rose about the Raymond Drive property, approximately?

A Two.

Q How did those communications take place, telephone, e-mail?

A One or the other, I don't recall.

Q Do you recall when those took place?

A Three years ago.
Q Was it before or after the sale of Raymond Drive to the Beauchamps?
A Around the same time; probably before, but... Around the same time. Oh, I'm sorry. Again, repeat the question, I'm sorry.
(Previous question read by reporter)
A (Continued) Before.
Q Did your communications with Jeffrey Rose regarding the Raymond Drive property concern the transaction between Kaleb Realty and Raymond 25 Associates?
A Yes.
Q In those communications -- well, okay, what was discussed in those communications?
A Attorney-client privilege.
Q Who is the client?
A Kaleb Realty and Jeff Rose, too, and Kaleb Realty.
Q So communications with Jeff Rose, in your view, are privileged based on your attorney-client privilege with Kaleb Realty, is that correct?
A No, Jeff Rose was also a client as well as his father; entities his father controlled and had, they were both clients.
Q I'm asking which client are you asserting the

privilege in this instance as a communication between you and Jeff Rose regarding the transaction between Kaleb Realty and Raymond 25?
A I have to say Kaleb Realty. Yeah.
Q So, in that capacity, you were not representing Jeffrey Rose?
A In a capacity of discussions, I probably was representing Jeffrey Rose as well during the context of the discussions that I had with him, yes. So, it would be Jeffrey Rose as a client and Kaleb Realty.
Q Were you providing legal advice to Jeffrey Rose with respect to the transaction between Kaleb Realty and Raymond 25 Associates?
A Yes.
Q Was anyone else involved in the communications that you had with Jeffrey Rose regarding the Raymond Drive property?
A My recollection there was no one else present.
Q So, you listed -- just so I'm clear, you listed Kaleb Realty and Jeff Rose and Vic Rose as the clients on whose behalf you're asserting the privilege?
A And Vic Rose's wife.
Q Emily Rose?
A Yes, Emily.

Q Any other clients?
A Well, it's a family, I've discussed with Adam, not Kaleb, though. It would be those three, Emily Rose, Kaleb -- Emily Rose, Kaleb, Jeffrey Rose and Victor Rose.
Q And that's it?
A Yes.
MR. O'NEILL: Two-minute break.
(PAUSE)
MR. KOVACEV: Back on the record.
Q Mr. Sheehan, you understand you are still under oath, right?
A Yes.
Q Have you ever heard of an entity called JEV Financial Corporation?
A Yes.
Q Have you done any legal work for JEV Financial Corporation?
A I'd say yes.
Q When did you start doing work for JEV?
A Five years ago.
Q Have you done any work for JEV in connection with the Raymond Drive property?
A I don't believe so.
Q Have you ever heard of an entity called Brownell

Corporation?
A There's a Brownell Realty, I believe. Again, Rose family, I've heard the name and on occasion been asked a question regarding real estate in connection with Brownell Realty.
Q Mr. Sheehan, did you prepare an engagement letter for your legal work for Kaleb Realty?
A No.
Q Do you submit bills to Kaleb Realty for your legal work?
A That's privileged information.
Q Yes or no question.
A Not monthly bills, not as most lawyers do.
Q Let me ask it this way. I assume that you do bill for work that you do for the Roses and the various entities, correct, it's not pro bono?
A There have been bills.
Q And have those bills been paid?
A Yes.
Q And where do those -- who are those bills sent to?
A Victor Rose.
Q Have they always been sent to Victor Rose?
A Yeah.
Q Have any bills ever been sent to Jeffrey Rose at any time in your representation of the Rose family?

A They may have been e-mailed to him.
Q Emailed to Jeffrey Rose?
A Yes.
Q And has Jeffrey Rose paid the bills that you e-mailed to him?
A That's privileged information.
Q I assume you maintain a client trust account, is that correct?
A No, I don't. I don't do, I don't have the need for it.
Q Or any accounting?
A I don't have a need for it. I don't have trust accounts.
Q Have you ever?
A In the past, yes.
Q But when did you stop using trust accounts or IOLTA accounts in connection with your legal practice?
A Couple of years, year and a half ago, two years ago.
Q You did have one -- well, did you have one about the time of the Raymond Drive transaction that we're talking about?
A I may have. I may not have had one. I haven't had the need for a client trust account in a while. It may have been three or four years since I had it. I don't do a lot of transactions for clients that I

would be handling trust funds.
Q What was the last institution where you had a trust account or IOLTA account?
A Probably Citizens.
Q Did you actually close that account at some point?
A I did, I'm sure I did.
Q Do you remember what year?
A Four or five, four years ago, maybe five years ago.
Q Do you remember whether it was before or after the Raymond Drive transaction?
A Right before.
Q When you got the proceeds from the sale of the Raymond Drive property, where did you deposit those proceeds?
A Probably Citizens Bank.
Q Would that be in your personal account?
A I don't recall.
Q Are there other accounts at Citizens that you control?
A I believe I had two at the time. Maybe I had one. I don't recall, I've had a number of accounts over the years, I don't recall at that time whether or not I had --
Q At Citizens have you had accounts that you had control over but that weren't your personal account?

A Yes, in the past.
Q Were these for corporations or some other entity, were they -- I'll ask, were those some sort of entity such as a corporation?
A I don't understand the question.
Q You said that you may have had a couple of accounts at any given time at Citizens Bank.
A Over the years, yes.
Q And those, and excluding the trust accounts that we talked about earlier, did you have any that you had control over that weren't in your name?
A No.
Q After you received the proceeds from the Raymond Drive sale to the Beauchamps, did you deposit them into any bank account anywhere?
A Probably Citizens Bank.
Q Would that be in your account at Citizens?
A Yes.
Q And excluding the $15,000 that was your share from the LLC, did the rest of the proceeds from the sale remain in the Citizens Bank account?
A For a period of time.
Q How long?
A I wouldn't know.
Q Days? Months? Years?

A Months or weeks, months.
Q So at some point they were withdrawn or transferred to a different account?
A Yes.
Q To whose account were they transferred to?
A Privileged information.
Q Who's the client on whose behalf you're asserting that privilege?
MR. O'NEILL: He's going to assert the privilege with respect to that question.
A I assert the privilege in connection with that question.
MR. KOVACEV: How can I assume whether there is an attorney-client -- how can a court assess it unless he can tell me who the client is?
MR. O'NEILL: Well, I guess you can't.
MR. KOVACEV: Perhaps the court will.
MR. O'NEILL: We'll leave that to the court.
Q Was the money transferred to this other account in a lump sum or in batches?
A Probably one check. I don't recall, but probably

one check.
Q It was actually a physical check that was written out?
A I don't recall, a check or wire transfer. I don't know. I don't recall.
Q Do you remember delivering it to somebody, physically?
A No.
Q Do you remember actually seeing a physical check containing the proceeds of the Raymond Drive --
A I don't recall if it was a check or wire transfer, I just don't recall.
Q I'm trying to probe your recollection to refresh it as best as I can.
A Three years ago, I don't recall if it was a check or a wire transfer. I just don't recall.
Q What financial institution did it go to?
A Probably Citizens, Citizens Bank probably.
Q So it went from your account in Citizens to a different account at Citizens?
A No, no, no, I'm sorry, I thought you asked when I received the proceeds where did it go. It went into my Citizens account.
Q I asked after it left your Citizens Bank account what financial institution did it go to?

A That's privileged information.
Q And who's the client that you're asserting that privilege for?
A Kaleb Realty.
Q To your knowledge, does Kaleb Realty have a bank account in its name?
A I don't know.
Q Did you send those proceeds to an account in Jeff Rose's name?
A Privileged information.
Q Did Jeff Rose, to your knowledge, ever receive the proceeds, any proceeds, from the sale of the Raymond Drive property?
A Privileged information.
Q You testified about a mortgage that was assigned by Kaleb Realty to Raymond 25 Associates, you remember that testimony?
A I do.
Q Had any payments been made on that mortgage at the time it was assigned to Raymond 25 Associates?
A Repeat that, I'm sorry.
(Pending question read by reporter)
A (Continued) I don't know.
Q Did you ever inquire of anybody as to whether any payments had been made on that mortgage?

A Attorney-client with Kaleb Realty.
Q Did anybody representing the Beauchamps ask you to determine if there was a balance due on the mortgage that was assigned to Raymond 25 Associates?
A No.
Q Did you ever assertain the balance owed on that mortgage that was assigned to Raymond 25 Associates?
A Yes.
Q When did you do that?
A Around three years ago.
Q Why did you do that?
A To determine the balance of the mortgage.
Q Why did you need to know the balance of the mortgage at that time?
A Attorney-client information, Raymond 25.
Q So we're clear, you're asserting the attorney-client privilege, you're refusing to answer that question?
A Yes.
Q When you ascertained the balance owed on the mortgage that was transferred to Raymond 25 Associates, was that before or after the assignment agreement was executed?
A Probably before.
Q And did you, in fact, ascertain the balance owed on that mortgage at that time?

A Yes.
Q And was there a balance owed?
A Yes.
Q Do you recall how much?
A Attorney-client.
Q Who's the client?
A Kaleb and Raymond 25.
Q You testified about negotiations that took place with respect to negotiating the assignment of the mortgage from Kaleb Realty to Raymond 25, you remember that testimony?
A Yes.
Q Who participated in those negotiations? Anyone participate at all in those negotiations, that's what I'm trying to ascertain?
A Victor Rose, Hal Panciera, John Sheehan and Raymond 25.
Q When you say Raymond 25, is that through you and Mr. Panciera?
A Yes.
Q At the time you were a member of Raymond 25?
A Yes.
Q And at the time you understood that you would be receiving some proceeds from the business deal that would come out of this assignment agreement, is that

true?
A I expected to.
Q You hoped to at least?
A Hoped to.
Q At some point did you become aware of a federal tax lien that encumbered the Raymond 25 property?
A Yes.
Q I'm sorry, the Raymond Drive property.
A Yes.
Q When did that happen?
A Prior to acquiring the mortgage.
Q Prior to Raymond 25 Associates acquiring the mortgage?
A Prior.
Q And how did you find out?
A A number of title searches.
Q Who conducted those title searches?
A A number of attorneys.
Q Number of attorneys?
A On behalf of Raymond 25 Associates.
Q Who were they?
A Attorney-client.
Q The identity of the attorneys that performed the title searches you're asserting an attorney-client privilege?

A Yes, they were engaged by Raymond 25.
Q Specifically --
MR. O'NEILL: Excuse me just a minute.
(PAUSE)
THE WITNESS: I'll withdraw that. A company called Elm Street Title, which works for lawyers in the State of Rhode Island. As I recall, I believe Russell Sicard, a title attorney, Russell Sicard. There was another attorney in Westerly, not Westerly, Wickford, I can't think of his name. Paul Sollitto, Attorney Paul Sollitto, and myself.
Q Who actually requested those individuals to do the title search, like what person?
A I believe I did.
Q That was on behalf of Raymond 25?
A Yes, and myself and Panciera.
Q I take it that the title searches resulted in the discovery of a federal tax lien that encumbered the property at Raymond Drive?
A Yes.
Q And at some point you became aware of that?
A Yes.
Q And you became aware of that fact before or after the assignment agreement on the mortgage we've been

discussing?
A Before.
Q Did you discuss that federal tax lien with Vic Rose?
A Attorney-client.
Q How about Jeffrey Rose?
A Attorney-client.
Q How about with Mr. Panciera?
A Attorney-client.
Q Did the assignment agreement mention the federal tax lien in any way?
A Attorney-client.
Q You're asserting attorney-client privilege as to contents of the assignment agreement?
A Yes.
Q Who received copies of the assignment agreement?
A Kaleb and Raymond 25.
Q When you say Kaleb, who is the person?
A Victor Rose.
Q And when you say Raymond 25, who are the people?
A Sheehan, Panciera and Coletti. Well, strike that, no. Raymond 25 received a copy, Panciera may have one, I don't know if Coletti ever got one. I don't know.
Q Did Jeff Rose ever receive a copy of the assignment

agreement?
A I don't know.
Q Did he ever see a draft of the assignment agreement?
A I don't know.
Q Did you ever send him one?
A No.
Q Did he ever ask anyone to send him one?
A No.
Q Did you ever discuss the structure of a potential assignment agreement with Jeffrey Rose regarding the Raymond Drive property?
A Attorney-client.
Q Did the assignment agreement include a sale price for the assignment of the mortgage?
A Yes.
Q What was it?
A Attorney-client.
Q Was the amount actually paid at some point?
A Attorney-client.
Q And who was it paid to?
A Attorney-client.
Q Did you ever discuss with Mr. Panciera the possibility of the IRS attempting to redeem the property at Raymond Drive?
A Yes.

Q When did you do that? When did you have those discussions with Mr. Panciera?
A Prior to the assignment agreement.
Q Did you ever have discussions with Jeffrey Rose regarding the possibility the IRS might redeem on the property?
A Attorney-client.
Q How about with Vic Rose?
A Attorney-client.
Q Did you ever use intermediaries in communicating with Jeffrey Rose?
A Attorney-client.
Q Did you ever ask someone to send a communication to Jeffrey Rose on your behalf?
A Attorney-client.
Q Have you ever seen a copy of the Kaleb Realty partnership agreement?
A Yes.
Q When did you see it?
A Three years ago.
Q Who did you get it from?
A Probably Victor Rose.
Q Have you ever heard of something called the Rose Family Trust?
A Yes.

Q What is the Rose Family Trust?
A I don't know specifically. I don't know.
Q Did you set up the Rose Family Trust?
A No.
Q Do you know who did?
A No.
Q Is there a trustee, as far as you know, of the Rose Family Trust?
A I believe it's Victor Rose. I believe it's Victor and Emily Rose.
Q Does the Rose Family Trust have any assets?
A I don't know.
Q Does it own any properties in Rhode Island?
A I don't know.
Q Have you ever prepared a power of attorney on behalf of Jeffrey Rose?
A I don't believe I did.
Q Are you aware that one exists?
A No. Strike that. No, I don't know. I don't know if one exists, and I didn't draft it.
Q Has anyone ever told you that there was a power of attorney that existed for Jeffrey Rose?
A Not specifically, no.
Q Or generally?
A Generally, I believe there's a power of attorney to

act on his behalf by his father. I don't know that, I believe that.
Q Has Vic Rose ever exercised that power of attorney on Jeff Rose's behalf?
A I don't know.
Q Earlier we talked about a Subpoena that you received in this case, do you remember that?
A Yes.
Q Like to show you what has been marked as Government's Exhibit 50, you want to look at that; whenever you're ready.
A (Complying) Okay.
Q Is this the copy of the Subpoena that you received?
A I have a copy of this, yes, I do. Wait a minute, different date.
Q Do you recall receiving two copies of the Subpoena on two different dates?
A Yes.
Q Would you look at Exhibit A, or an Attachment A to Exhibit 50.
A Yes.
Q It's the last two pages of the exhibit.
A Yes.
Q Do you recognize those?
A Yes.

Q Does that reflect the Attachment A to the Subpoena that you were served with in this case?
A Yes.
Q Did you undertake to search for any documents responsive to any of these requests?
A Yes.
Q What did you do to search for them?
A Went through the files.
Q What files?
A Rose files.
Q When you say the Rose files, what do you mean by that?
A Well, any files relating to the Rose family.
Q I take it you maintained files?
A Some files for the Rose family and their related entities, that's correct; the Rose family members and their related entities on their --
Q Are those files located at the Green Lane address?
A Yes.
Q Are there additional files that are in storage somewhere, or do you have all the files that you're aware of?
A I have all the files. There may be some older files in storage, but recent files I would have at my office.

Q How long have you represented the Rose family?
A Four to five years.
Q Have you ever represented any members of the Rose family in litigation?
A Yes.
Q How many times? How many cases?
A Ten to twelve.
Q Were those in Rhode Island Superior Court?
A Yes.
Q Were there any in any other court?
A At municipal court, county court, things like that, superior court primarily.
Q Looking back at Attachment A of Exhibit 50, Item No. 1 where it asks for documents related to the Raymond Drive property that we've been discussing --
A Yes.
Q (Continued) -- did you search for documents related to the Raymond Drive property in the Rose family files that you've maintained?
A Yes.
Q Did you find any?
A Yes.
Q And did you bring them with you today?
A No.
Q Why not?

A Attorney-client privilege.
Q Have you prepared a privilege law that you're prepared to give me?
A No.
Q Why not?
MR. O'NEILL: Objection, that's argumentative.
MR. KOVACEV: You can answer.
A I don't know. I don't appear in federal court at all, I am not aware of the rules.
Q How many documents did you find with respect to the Raymond Drive property that are responsive to this No. 1?
A A file.
Q Is there a file related to the Raymond Drive property?
A Yes.
Q How thick is the file, is it just a few pages, a substantial file?
A No, it's inch and a half thick.
Q Inch and a half thick?
A Yes.
Q And those are all documents related to the Raymond Drive property in some way?
A Yes.

Q And that's part of the Rose files?
A Part of it, yes.
Q And part of it are --
A Raymond 25 Associates, John Sheehan, Harold Panciera, title searches, but it's all in one file.
Q You maintain a separate Raymond 25 Associates file?
A No.
Q Do you maintain a separate Hal Panciera file?
A No. As to Raymond 25, as to 25 Raymond Drive, no. I maintain a separate Harold Panciera file but not Harold Panciera a/k/a Raymond 25.
Q Is there a separate Harold Panciera file that involves other deals that you have worked on with Mr. Panciera?
A Legal work I've done.
Q As it relates to property in Bristol?
A That was one.
Q Looking at No. 2 on Attachment A to Exhibit 50, you see that?
A I see it.
Q Did you find any documents responsive to that No. 2?
A I have a number of documents in connection with that, yes.
Q And you did not produce them today, correct?
A No.

Q And why not?
A Attorney-client, as to the contents of the files.
Q I will ask you the same question with respect to No. 3. First off, did you locate any documents that are responsive to request No. 3?
A I have no records of any business operations, et cetera, for Kaleb, JEV, Borland, Nomar, Rose Family Trust, or other entities of Jeff Rose. I have business records of Raymond 25, but as to the others, the only business records I would maintain would be those which dealt with Raymond 25, such as Kaleb Realty, copies of documents such as the assignment, title searches, et cetera, but as to the others, I have no notes within the context of that question.
Q Do you have -- what's the nature of the business records that you have for Raymond 25 Associates?
A The whole deal.
Q Let me ask it this way. Do you have financial statements?
A No, I'm sorry, no, I don't. No.
Q Do you have bank records?
A No.
Q Tax returns?
A I have a copy of a tax return, yes.

Q Now, you received a K-1 from Raymond 25 Associates, correct?
A Yes.
Q Now, I take it that you incorporated that into your own personal income tax return?
A Yes.
Q And Mr. Panciera, was he the tax matters partner for Raymond 25?
A Yes.
Q Did you assist in preparing the tax return for Raymond 25 in any way?
A No.
Q Does Kaleb Realty have any financial statements?
A I don't know.
Q Well, have you seen any?
A No.
Q How about Borland Realty, does that have any financial statements that you've ever seen?
A I've never seen any.
Q Did Raymond 25 Associates ever use the services of an accountant?
A Yes.
Q Who?
A I don't know, Hal Panciera handled that.
Q Did Kaleb Realty -- is it Kaleb or Kalup (sic)?

A I think it's Kalup but could be Kaleb.
Q How have you heard it?
A I guess both ways.
Q Kaleb Realty, does that have an accountant?
A I don't know.
Q How about JEV?
A Don't know.
Q Borland Realty?
A Don't know.
Q And you didn't produce, I don't think I asked this, you're not producing any documents responsive to this question No. 3?
A I am not.
Q And why not?
A Well, I don't have -- as to the request, look for, I think I can say I don't have any.
Q With respect to Raymond?
A No, other than what -- with respect to Raymond 25 Associates, I have no other records.
Q With respect to Raymond 25, you do, though, correct?
A Yes, I have records, that's right.
Q You haven't produced those?
A No.
Q Why not?
A Why not?

Q Is it your position that the tax return for Raymond 25 Associates is privileged information?
A Yes. Yeah.
Q Was the tax return filed with the Internal Revenue Service?
A Raymond 25, yes, it was.
Q Just so we're all clear, you're asserting that a copy of the tax return that was filed with the Internal Revenue Service is privileged, is that your position?
A Well, I guess the tax return prepared by the accountant and is sent to the internal revenue would not be privileged. I don't know, I don't have a copy of it. Strike that. I may have a copy. I never looked at it; if I got it, I just never looked at it, so...
Q I take it you looked at the K-1 when you prepared your own tax return?
A But as to the other ones, I don't have any information on them under these records.
Q Looking at No. 4 under Attachment A, will you take a look at that.
A Yes.
Q Did you identify any documents responsive to that request?

A Yes.
Q Were those located in the Rose family files?
A Yes.
Q And are you producing any today?
A No, attorney-client as to all these entities on Item 4.
Q The documents that you have include either receipts of wire transfers or copies of checks?
A Attorney-client privilege.
Q Look at No. 5, do you see that, No. 5, Attachment A?
A I do.
Q Do you have any of the records that are requested in No. 5?
A I have no time sheets, never kept time sheets in thirty-five years for anybody, to my detriment, but that's okay, I have none.
Q Do you generally work on a fixed fee basis?
A A variety of different ways generally speaking.
Q With respect to Raymond 25, how was your compensation for your legal work set?
A That's attorney-client privilege.
Q How much did you receive from Raymond 25 for your legal work?
A Attorney-client privilege.
Q So, do you have, putting aside the time sheets, do

you have billing records that are responsive to request No. 5?
A No. No.
Q You have no invoices?
A No.
Q How do you --
A Just don't do that.
Q How do you ask for money?
A I just ask for it, I just ask for a check, I just ask.
Q Orally request it?
A Usually, yeah, sometimes in letter form.
Q Is that --
A At the conclusion of a case, I may send a client a bill.
Q Did you find any such bills relating to any of the entities that are listed here in No. 5?
A I did not find any billings, no.
Q Just so we're clear, are you withholding any documents that are responsive to this request No. 5 --
A No.
Q (Continued) -- on the basis of privilege or any other reason?
A I have no billing records and I have no detailed

time sheets, so I'm not withholding, I don't have any, that's a response to my question, I don't have any.
Q I appreciate that.
A Right.
Q Look at No. 6.
A Yes.
Q Now, looking at six you referenced earlier that there's a telephone number that you used to contact Mr. Rose.
A Yes.
Q And you mentioned that you have that at home?
A Yes.
Q And did you bring it with you today?
A No.
Q Why not?
A Attorney-client privilege.
Q So a phone number is attorney-client privilege in your view?
A In my view, yes, it is. There may be a phone number -- yes attorney-client privilege. I believe it's an attorney-client privilege, that phone number, I do.
Q How did you get that phone number, who gave it to you?
A I don't recall. I don't recall who gave it to me.

Q Well, somehow you found a way --
A Somehow I had, yes, I was communicating via telephone; how it started, I just don't recall.
Q Are you aware that Jeffrey Rose is not in the country, in the United States?
A I don't believe he's in the United States, no.
Q Where is he?
A Well, that's attorney-client, that's attorney-client.
Q Where is the last place, location, where you know that Jeffrey Rose was?
A Attorney-client.
Q Over the past four years since he left the United States, where has Jeffrey Rose been?
A Attorney-client.
Q If you need to get in contact with Jeffrey Rose today, could you do it?
A I don't know, I could attempt to do it.
Q How would you attempt to do it?
A By e-mail or telephone.
Q And that would be on the phone number that you mentioned earlier that you're not disclosing today?
A Yes, yes.
Q When is the last time you used that phone number to contact Jeffrey Rose?

A Eight months ago, maybe a year ago.
Q Do you know whether it's a land line or a cell phone?
A I don't know.
Q Do you know whether it's a phone number from the United States or from a different country?
A I honestly don't know, no.
Q How many numbers does it have?
A The normal amount of numbers, area code and seven digits thereafter.
Q So, just to make sure that we're correct with respect to attachment No. 6, you have documents that are responsive to that request, correct?
A Yes.
Q And you're not producing them today.
A Yes.
Q And why are you withholding?
A Attorney-client privilege.
Q Is there any other reason, other than attorney-client privilege, that you're withholding?
A I'm sorry?
Q Any other reason, other than attorney-client privilege, that you're withholding those documents?
A No.
Q How about any documents that are attached in all of

Attachment A, any of the categories, is there any other reason that you're withholding those documents, other than attorney-client privilege, that you're not producing them today in response to this Subpoena?

A I hadn't thought of any. I didn't reflect on that question, so I don't know the -- if I reflect on the question --

Q Reflect on it for a moment.

MR. O'NEILL: I think the question's been asked and answered, he's not producing the documents 'cause in view of the attorney-client privilege.

Q (Continued) And that's the only reason?

MR. KOVACEV: A legitimate question, if it's going to be litigated, I need to know what you're litigating about.

MR. O'NEILL: I think the proper forum would be for you to prepare whatever motions you wish to prepare and for us to then respond.

Q Just, so I'm clear --

MR. O'NEILL: In all due respect, that's our motion.

A In response at this point, the attorney-client privilege, that's what I am prepared to say. I had

not reflected and I think it takes a little more reflection to respond properly to the question for your benefit and for my benefit as well, so...

MR. O'NEILL: I mean, it's not impossible in a response we might learn some other information that causes us to assert other privileges, recognizing that, I believe, it's become known that there's a grand jury investigation, a companion investigation, to this civil litigation that you're pursuing.

MR. KOVACEV: I'll disagree with you that there's any relationship between this civil case and any grand jury investigation that may be going on.

MR. O'NEILL: There's a grand jury investigation being conducted with respect to certain of the parties that you've inquired of Mr. Sheehan, is there not?

MR. KOVACEV: Certainly I'm not connected with any grand jury investigations in a civil case, in a civil tax case.

MR. O'NEILL: Just so -- we've been led to believe that that's the case.

MR. KOVACEV: Okay.

MR. O'NEILL: I believe you shared

that with me as a result of, perhaps, counsel for the Beauchamps shared with you, quite possibly.

MR. KOVACEV: I think I related to you that counsel for Vic Rose had indicated to me --

MR. O'NEILL: Vic Rose, excuse me.

MR. KOVACEV: -- he understood there was a grand jury investigation, that's all.

MR. O'NEILL: So you know it secondhand.

MR. MARUSAK: Thanks for clarifying that, because that was news to me, I wasn't shared anything.

MR. O'NEILL: I'm sorry, you knew it secondhand, I knew it third hand, but, nevertheless, it gives us cause to pause as they say.

Q Other than your attorney, have you discussed the fact that you're being deposed today with anybody?
A My wife.
Q Anyone else?
A Another attorney.
Q Who?
A Ben Cerilli.
Q Is Ben Cerilli representing you in connection with this case?
A No.

Q What is it that you've told Mr. Cerilli, well, about
your deposition today?
A That there was one.
Q Why did you tell him?
A To ask him to call Jim O'Neill.
Q Have you ever talked to Hal Panciera about the fact
that there's a civil tax case involving the Raymond
Drive property?
A Yes.
Q When did that happen?
A Several months ago. He told me there was a case
pending, and I think he might have said that he
received a Subpoena for records.
Q And did you respond?
A Did he respond?
Q Did you respond to what -- when Mr. Panciera said
that, what did you say?
A I said prepare the records and I presume he did. I
no longer associate with Mr. Panciera, but I
indicated to him he needs to respond to the
Subpoena.
Q You say you no longer associate with Mr. Panciera,
what does that mean?
A We're no longer friends or business associates,
doesn't matter why, personal reasons.

Q Does it have anything to do with the Raymond Drive --
A No, no, no.
Q (Continued) -- transaction?
A No.
Q Not at all. Does this have anything to do with any business transactions that you were involved in?
A Yes.
Q Is that the subject of litigation somewhere right now?
A It will be.
Q Have you spoken with -- was that the only conversation or the only communication that you had with Mr. Panciera about this case?
A Yes.
Q How about Don Coletti, have you ever spoken to Don Coletti about this case?
A Yes.
Q When was that?
A Several months ago.
Q What was the context of that conversation?
A That there was a case pending, Beauchamp's upset and that there was basically a case pending and he asked me to call the firm which had handled the closing for Beauchamp and I did.

Q Why did he ask you to call them?
A 'Cause they called him. The law firm, I guess they'd been served, their client had been served.
Q What law firm is that?
A They're in Cumberland, I forget the name of the firm. They represented Beauchamp when he bought the property. I think it's Cumberland; yeah, Cumberland, Rhode Island, it's a town.
Q Did you contact anyone from that firm?
A I called, left a message, they didn't get a call back.
Q Who did you call?
A The attorney whose letterhead was in the file as having handled the closing.
Q Do you remember that attorney's name?
A No.
Q And you never received --
A No call back.
Q Did you ever receive any letters, documents from that law firm in connection with this dispute?
A No.
Q Did JEV Financial have a tax deed on the Raymond Drive property at some point?
A It was a very long title, complex, there may have been a JEV deed on a subsequent tax sale which

apparently wasn't redeemed -- apparently had been redeemed because that tax sale or that legal thing didn't proceed, that's my determination at the time. There's been many tax sales on many properties. Providence, Rhode Island, they handle them every six months, you don't pay your taxes, you lose your property. So, there's a lot of people who deal in that business and I would not be surprised if JEV had bought the future taxes at some point in time.

Q At the time when the assignment agreement was executed, was there a tax deed --

A I was satisfied --

Q (Continued) -- prepared?

A I don't recall, if there'd been one, it would've been cleared up at the time of closing.

Q Of the closing of?

A To Beauchamp.

Q Do you recall it being an issue as to --

A There were back taxes, I'm just not sure whether merely back taxes, or back taxes as a result of a sale, or they were relatively recent taxes, a year and a half or so, not much older than that. Whatever taxes were owed on the real estate were cleared up and adjusted at the time of the closing.

Q Was that tax issue resolved before or after the

foreclosure?
A After the foreclosure, at the closing with Beauchamp.
Q Did you ever see a copy of the note connected to the mortgage that was transferred under the assignment agreement?
A I don't know that I did.
Q Did you ever ask for it?
A I'm sure, it would be attorney-client as well, Kaleb Realty.
Q I'll show you what has been previously marked as Government Exhibit 22, and --
MR. O'NEILL: Can I interrupt for one moment.
(RECESS AT 1:05 P.M.)
(RESUMING AT 1:50 P.M.)
MR.KOVACEV: Back on the record.
Q Mr. Sheehan, in front of you is what's been previously marked as Government Exhibit 22, you see that?
A I do.
Q You're free to look at whatever you want. I will tell you the first question I'm going to ask is going to be starting at the Bates number, which is the numbers in the bottom left corner, USA 0036, if

you look at the numbers on the bottom right.
A Oh, 36, okay.
Q 36, yes. If you look at 36 and 37 and 38 and 39 together.
A Yes.
Q You see that?
A I do.
Q Do you recognize what's contained in those pages?
A Okay.
Q Do you recognize those documents?
A I do.
Q What are they?
A The final foreclosure deed and related documents.
Q Now, did you prepare these documents?
A Yes.
Q Look at the document with the Bates number ending in 38, it's Affidavit of Sale Under Power of Sale of Mortgage.
A Yes.
Q You see that?
A I do.
Q If you look at the very bottom, there's a signature for notary public?
A Yes.
Q Is that your signature?

A It is.
Q Did you, in fact, notarize this document?
A I did.
Q You're a notary I take it?
A I am.
Q Now, does this document reflect a part of the documentation for the foreclosure sale of the Raymond Drive property?
A It's apart of that, yes.
Q And if you look at the second text paragraph, it states, "And I further depose and say...?"
A Yes.
Q At the bottom there is a reference to a $300,000 figure, at the bottom of that paragraph?
A Yes.
Q Saying that the premises were sold to Raymond 25 Associates for $300,000?
A I see that.
Q Did $300,000 actually change hands at that time?
A Attorney-client privilege.
Q Was there ever a bid made by Raymond 25 Associates for $300,000 for the purchase of the Raymond Drive property?
A Yes.
Q Who made that bid?

A Either myself or Harold Panciera, I don't recall who.
Q How was the bid made? Physically how was it made?
A To the auctioneer.
Q Who's the auctioneer?
A Skip Pontes, P-O-N-T-E-S, I believe Shechtman & Company is the name of the company.
Q So, I take it there was an actual auction on or about January 19, 2006?
A Yes.
Q Were there any bids other than Raymond 25 Associates?
A No.
Q Did anyone attend other than the auctioneer and you and Mr. Panciera?
A There was some people there, yes.
Q Did you know any of them or recognize any of them?
A No, no.
Q Were there other properties for sale at the same auction, were there other properties?
A No.
Q Just Raymond Drive?
A Just the single property, right.
Q None of the other people there made a bid for the property?

A Didn't make a bid, no.
Q If you could look at the page ending in Bates No. 41 titled "Assignment of Mortgage," you see that?
A Okay.
Q Did you prepare that document?
A Yes.
Q And looking at the bottom where it says "Notary Public," is that your signature?
A It is.
Q Did you, in fact, notarize this document?
A I did.
Q The date of this document is July 25th, 2005, you see that?
A Yes.
Q When did the assignment actually take place?
A That day.
Q When was the assignment agreement executed?
A Prior to that day.
Q How long prior?
A I don't know. I don't know.
Q Prior to this date, July 25th, 2005, who held the mortgage on the Raymond Drive property?
A Kaleb Realty.
Q So, up until July 25th, 2005?
A That's the date of the assignment.

Q Now, if you look at the bottom, this says "Received For Record," the bottom left "On 6-20-06?"
A Yes.
Q You see that?
A Okay.
Q Was this submitted to the Narragansett Town Clerk on or about June 20th, 2006?
A Must have been, yup.
Q Did you do that, did you submit it to the town clerk for recording?
A I probably recorded it. I probably recorded it. I don't recall, but I would've been the one who would've recorded it.
Q And that would have been in June of 2006?
A If her date is correct on June 20th of 2006, that's correct.
Q Do you have any reason to believe the date on that stamp is incorrect?
A The 6th -- I'm sorry, no, I would expect that would be the correct date.
Q Why did you not record this document until June 2006?
A It may have taken eight months to negotiate the deal. I don't recall why. The assignment would've been around the time that we probably concluded our

agreement. If I may review that?

(PAUSE)

A (Continued) It may have been recorded in conjunction with the recording of the other documents. It was recorded a couple of months after the foreclosure. It was recorded after the foreclosure.

Q Why did you wait until after the foreclosure to record the assignment of mortgage?

A I may have been just neglectful. I may have thought it had already been recorded.

Q If you look at the last page of this exhibit, Bates number ending in 42, you see that?

A Yes.

Q Have you ever seen that before?

A No, I don't recall having seen this before. Actually -- okay.

Q Do you recognize that document?

A No.

Q Did you record that document?

A I don't think I recorded any of these documents. They all relate to the sale and that would've been recorded, it relates to the payment of taxes, which may have been outstanding on the house and I would suspect this was recorded by the title attorney.

Q Does this refresh your recollection as to whether there had been a tax sale that had taken place around the time that you were negotiating the sale of the Raymond Drive property?

A There had been several tax sales in the record, but I don't recall this one specifically, but from a legal point of view, the taxes get paid at the closing so you're not in jeopardy of any deed liens looming ahead where you have to cure those immediately. Traditionally, it gets taken care of at the closing, whatever redemption needs are required and get done at the time of closing, but I don't specifically recall that there were taxes owed or the tax sale was held by JEV. It wouldn't surprise me if it was, but...

Q Turning back to page 41.

A (Complying)

Q I take it you actually saw that Vic Rose -- that's Vic Rose's signature?

A It is.

Q Now, I take it you actually witnessed that?

A I did.

Q That took place on July 25, 2005?

A Yes.

Q Where did it take place?

A In Barrington.
Q In Barrington, you mentioned a copy shop?
A Coffee shop, yeah.
Q Do you remember what coffee shop?
A No, no, I don't. I know where it is, but I don't know the name of it.
Q Who set up that meeting?
A Victor Rose and myself.
Q Who initiated it?
A Probably me.
Q And what was the purpose of meeting with Vic Rose in Barrington on that day?
A Apparently to execute the Assignment of Mortgage.
Q Was there any other documents executed by Vic Rose at that meeting?
A Other documents were executed, they may have been at the same date, could have been on the same date, may have been prior to that date, but could have been the same date, I just don't recall.
Q Which documents?
A The agreement.
Q Which agreement?
A The assignment agreement.
Q Anything else?
A I don't recall.

Q Did Vic Rose sign a trust, any sort of trust document, a trust agreement --
A No.
Q (Continued) -- on that date?
A No, it was strictly relating to the mortgage.
Q And did you discuss the assignment agreement with Vic Rose at that meeting?
A Yes.
Q And what was it that you discussed with him?
A Attorney-client.
Q Did you discuss with him the negotiations that --
MR. KOVACEV: Well, let me ask you this.
Q Was that one of the negotiations that you had referenced earlier as far as negotiations of the assignment agreement between Kaleb Realty and Raymond 25?
A That was one of the occasions, that's correct.
Q And there were occasions before then where you had negotiations --
A Yes.
Q (Continued) -- between -- with you and Vic Rose involving that assignment agreement?
A Yes.
Q And you're refusing to answer questions about those

negotiations on the grounds of attorney-client privilege, is that correct?
A Yes.
Q Who came up with the idea of creating an LLC entity that became Raymond 25 Associates?
A Best way to do it.
Q Yeah, but who came up with the idea is my question?
A Well, since I represented the group, it was probably my idea, as I would do for any other group.
Q Why you said --
A It's a beneficial entity to buy and sell businesses, real estate, airplanes, it's just a better method of acquiring an asset.
Q Now, whose idea was it to use an assignment of the mortgage as a vehicle for transferring an interest in Raymond Drive to Raymond 25 Associates?
A Probably mine.
Q Why?
A It's another, not common method, but it's a method that you would control a piece of property.
Q Now, Raymond 25 could've purchased the property outright, correct?
A No, no.
Q That would be impossible for Raymond 25 to purchase the property?

A Well, I think the house sat there for ten years and nothing happened to it.
Q That wasn't my question.
A I can't answer your question. You're asking could Raymond 25 have bought this house.
Q As opposed to purchasing an assignment of the mortgage.
A Sure, it could've.
Q Was that discussed, that possibility, that Raymond 25 could purchase the property?
A It was probably discussed.
Q By who?
A By myself and Victor Rose.
Q And I take it that was decided against doing it that way, correct?
A The end result was we agreed to have an assignment of the mortgage.
Q And why?
A Just the best way to do it.
Q Why is it the best way to do it?
A It's the legal thought process, addressing it with my client, Kaleb Realty, and the end result was as you see on the record. Lawyers do things certain ways but how they do that in discussion with their client is really a privilege, but the end result, at

the end of the day, it ended up with an assignment of mortgage.

Q Well, just so we're clear, the question is why was this deal structured as an assignment of the mortgage to Raymond 25 from Kaleb Realty as opposed to a sale of the property outright to Raymond 25 from the title owner of the property?

A Attorney-client.

Q Did you discuss with the other members of Raymond 25 Associates whether to purchase the property outright as opposed to purchasing an assignment of a mortgage?

A Yes.

Q And what were those discussions?

A Attorney-client privilege.

Q Now, the deal is structured so that --

MR. KOVACEV: Let me ask it this way.

Q Was the deal structured so that Raymond 25 would foreclose on the property -- ask it this way, was it anticipated at the time the assignment agreement was executed that Raymond 25 would foreclose on the property?

A Yes.

Q And what was the purpose of that?

A Attorney-client.
Q Who is the client that you're claiming privilege for?
A Raymond 25.
Q Was there a discussion regarding a subsequent sale of the property after this foreclosure by Raymond 25 to a third party?
A Yes.
Q Was there a discussion as to a time, a time when that would take place?
A Yes.
Q Was there a discussion as to how long after the foreclosure, the foreclosure, that a sale to a third party should take place?
A Yes.
Q What were those discussions?
A Attorney-client privilege.
Q And who were those discussions with?
A Hal Panciera and Don Coletti.
Q Anyone else?
A Vic Rose.
Q Anybody else?
A No.
Q Did you communicate with Jeff Rose about the issue of time of sale of the Raymond Drive property for a

certain period of time after the foreclosure?
A In regard to the first part of your question, did I discuss it with Jeff Rose?
Q Did you communicate with Jeff Rose?
A Did I communicate with Jeff Rose. His father was the focus of the discussions. I may have communicated with him about it. I don't recall.
Q Did Jeff Rose have an interest in the Raymond Drive property at the time?
A No, not to my knowledge. I don't know. Not to my knowledge.
Q So why was he requesting -- so why were you discussing the Raymond Drive property with Jeff Rose if he had no interest in the property?
A Well, it's his father.
Q Can you explain that a little bit?
A It's a close family. I don't recall. I don't even recall whether I discussed it with Jeff Rose at that time, I may have, but if I had to answer, I'd say, no, I didn't, but I don't recall, but there was no reason to, but I am sure his father was discussing it with Jeff, if, in fact, he did, he would do that.
Q Did Jeff Rose have any input into the structure of the transaction?
A No.

Q Did you send him any memoranda regarding the transaction?
A I don't recall.
Q Did you send him any e-mail discussing potential terms of the transaction, I mean, send an e-mail to Jeff Rose?
A I don't recall that I did.
Q Did you ask someone else to send an e-mail to Jeff Rose regarding structure of the deal that became the assignment agreement?
A I don't believe I did. The focus was his father, and who's here in Rhode Island at the time, back from Florida.
Q And at the time Jeff Rose was no longer in the country, right?
A To my knowledge, he was not in the country.
Q I take it there were negotiations of the sale of the Raymond Drive property to the Beauchamps, correct?
A Yes.
Q And you participated in those negotiations?
A No.
Q Not at all?
A No.
Q Did you have any communications at all with either

the Beauchamps or somebody representing the Beauchamps?
A Yes.
Q What were those?
A To his attorney, to Beauchamp's title attorney.
Q What were those discussions?
A Discussions in connection with a foreclosure, title, general discussions about that.
MR. MARUSAK: Can we have some contact as to when this occurred.
MR. KOVACEV: Okay.
A (Continued) Sometime within sixty days prior to the closing to the Beauchamps, that's within that range of time, within forty-five days, perhaps, of their closing.
Q In those discussions that you had with the Beauchamps' lawyer before the closing, did Jeff Rose's name come up?
A I don't recall specifically the context but I'm sure it did because of the tax lien that was against the property.
Q So, I take it you had discussions about the tax lien with the Beauchamps' lawyer?
A Yes.
Q And this was before the closing?

A Yes.
Q What were those discussions?
A Attorney-client on behalf of Raymond 25 Associates.
Q So, you're claiming privilege on discussions that you had with the Beauchamps' attorney.
A Right. My client was Raymond 25 Associates at the time and the discussions I had with the attorney were privileged information.
Q Discussions that you had with the Beauchamps' attorney --
A Right.
Q (Continued) -- are privileged?
A Yes, I believe it is.
Q Were you representing the Beauchamps?
A No, Raymond 25.
Q Was -- just so the record is clear, you, in the sale, in the negotiations for the sale of Raymond Drive property from Raymond 25 to the Beauchamps, you did not represent the Beauchamps, correct?
A No.
Q You had communications with a lawyer who you understood was representing the Beauchamps?
A Yes.
Q And you will not disclose the content of those discussions on the grounds of attorney-client

privilege?
A As to Raymond 25.
Q When you say as to Raymond 25 --
A They're my client, Raymond 25 -- Raymond 25 discussed with Keith Beauchamp certain aspects of the transaction, I happen to represent Raymond 25, so I was their spokesperson, but the client was Raymond 25, so the contents of those discussions as between my client and his, Keith, whatever, Beauchamps, through his attorney, in my position, are privileged.
MR. KOVACEV: Off the record.
(PAUSE)
MR. KOVACEV: Back on the record.
Q Are you going to change that the answer?
A I am.
Q Okay.
A The discussions were generally about the title to the property, we discussed the title, very complex title.
Q And specifically about the tax lien?
A Yes.
Q What were the discussions you had with the Beauchamps' lawyer about the tax lien?
A That the, I don't recall specifically, specific

language of it, but it was relating to the timing of or the priority, if you will, of liens and on the United States statute in connection with foreclosures and the right to the U.S. Government as far as a foreclosure sale occurred, he, Keith, examined things and we discussed whether the title was clear or not clear.

Q And what was the conclusion that the two of you reached in these discussions about the tax lien in terms of whether the title was clear or not?

A They bought the property. As far as I'm concerned, the title's clear.

Q And is that because the 120 day period had passed after the foreclosure by Raymond 25?

A Among other things.

Q What were the other things?

A They were notified by certified mail, two different offices out of an abundance of caution; the statutory period went by, and it went well past, as I recall, the dates, but I was satisfied, their attorney was satisfied and all the requirements had been complied with under the statute and the IRS had not elected to void the sale or come in and make a bid for that property for the amount, and their period of time lapsed, thereafter properties are

free to, at least under these rules, they would be free to dispose of property in any manner that he saw fit, Raymond 25.
Q When you say payment of the amount, what amount would the IRS have had to pay in order to redeem the property after the foreclosure sale?
A The reflected price of three hundred thousand.
Q Who set that $300,000 price?
A Raymond 25 bid it, bid the price, bid the three hundred discussed by the members.
Q Why was three hundred arrived at?
A That's privileged information.
Q You participated in the discussions among the members of Raymond 25?
A Yes.
Q Mr. Panciera and Mr. Coletti did as well?
A Yes.
Q Did you provide a copy of the assignment agreement to the Beauchamps' lawyer?
A I'm sure I did. I have no recollection of -- strike that. I faxed, I'm sure I faxed a variety of documents to them prior to the closing and I'm sure that was one of the documents. I don't recall specifically, but I'm sure that I did, that would be a normal package of documents to go to a buyer's

attorney.
Q Is there anything in your files that would reflect whether you had sent that or not, the assignment agreement, to Beauchamp's lawyer?
A May have been a fax transmission sheet, there may be. I know they received documents from me.
Q Did you discuss with the Beauchamps' lawyer whether Jeffrey Rose would need to approve the sale?
A No.
Q Well, showing you what's been previously marked as Government Exhibit 13, take a look at this.
A (Complying)
Q The question is, do you recognize this document?
A Not -- I recognize what it is, yes.
Q What is it?
A It's a transmission from Walsh & Brule directly to me.
Q And is one of the fax numbers listed here your fax number?
A Yes, it is.
Q Which one?
A 848-5045.
Q Now, you see the message part on the first page, there's handwriting there?
A I do.

Q In the middle there's a reference to an accountant's affidavit about the amount of the mortgage, do you see that?
A Yes.
Q Did you ever provide an affidavit from an accountant about the amount of the mortgage?
A I don't know that I did.
Q Was any such affidavit ever prepared?
A Yes.
Q And who was the accountant who was to sign the affidavit?
A I don't recall his name.
Q Was it ever executed, that affidavit? Was it ever signed?
A I'm sorry, strike that. I don't know that I have an accountant's affidavit, I don't believe I have an accountant's affidavit as to the amount owed, no, I do not.
Q Do you know why the Beauchamps' lawyers were asking for an accountant's affidavit?
A You ask for whatever you can get and you bargain down from there. I mean, I don't know, that's probably they're looking for as much as they can get, because the title was a very, messy title, so they certainly would like to get as much as they

could for their file.
Q What did you provide for their file regarding the amount of the mortgage?
A I don't think I provided anything to them about the amount of the mortgage. There was no reason for me to do that.
Q Look at the next sentence, "I am wondering if you have contacted Jeffrey Rose about signing yet." Do you have any understanding what that means?
A I didn't contact Jeffrey Rose about signing. That wasn't, that wasn't even in the cards, so... They may have asked for something from Jeff Rose, but I'm sure my follow-up discussions was that nothing would be forthcoming from Jeffrey Rose.
Q Do you remember them asking about --
A Not until I saw this.
Q Well, do you now remember anything?
A Not really, no, but, again, it's something that they would want to have, would like to have in their file but it wasn't required as far as I'm concerned.
Q If you look at the page that's Bates number ending in 086, third page of this exhibit?
A (Complying)
Q You see that?
A Yes.

Q Do you recognize that, do you recognize that page?
A I repeat again, he is the fellow that handled the matter, he was faxing things back and forth. Apparently he faxed me that page with a cover sheet on June 22d of '06.
Q Now, there's handwriting on that page, says, "We got affidavit but need 120 day redemption period waived in writing by IRS."
A Yes.
Q You see that?
A Yes, I do.
Q Do you know whose handwriting that is?
A No.
Q It's not yours?
A No, it's not mine.
Q Did you ever get a waiver in writing from the IRS of the 120 day redemption period?
A No.
Q Look at the numbered paragraph (5), the one that starts, "The foreclosure deed is a little suspect?"
A Yes.
Q The second sentence, "It says the mortgagee paid $300,000 to buy it back at foreclosure, but from what I can see, the mortgage amount was much less than that." You see that?

A I do.
Q When you saw this fax and you saw that sentence in that paragraph, did you respond?
A I'm sure I discussed that item with Peter Hainley at the time.
Q What did you discuss with him?
A I don't recall, probably I went through item by item, I'm sure, and, apparently, my discussions led him to believe that that was not an issue.
Q Next sentence says, "If that is the case, the recital that there were no proceeds to the mortgagor is incorrect;" you see that?
A Yes.
Q Did I read that correctly?
A Yes.
Q Did the mortgagor actually receive any proceeds on the 25 Raymond Drive?
A Attorney-client.
Q Did he ever respond to this comment in the e-mail that's part of Exhibit 13 about whether there were proceeds that went to the mortgagor?
A In looking at it now, it does't matter. I mean, it's got nothing to do with the closing as far as I'm concerned. It wasn't relevant to the transfer of title to Beauchamp.

Q My question was, did you ever discuss with the Beauchamps' lawyer whether any proceeds went to the mortgagor?
A I'm sure I didn't.
Q You're sure you did not?
A I'm pretty sure I would not've discussed that with them.
Q Did you have any discussions about any other Narragansett property, other than the Raymond Drive property, with Jeff Rose in the 2005 time frame?
A No.
Q Let's show you what's been previously marked as Government Exhibit 4.
A (Complying) Okay.
Q Do you recognize this document?
A No.
Q Did you ever send an e-mail to Hal Panciera asking for Jeff Rose's e-mail address?
A No.
Q Did you ever forward an e-mail regarding the Raymond Drive property agreement to Mr. Panciera to send to Jeff Rose?
A Apparently I did.
Q Why did you do that?
A Information purposes.

Q Why did you route it through Mr. Panciera?
A I don't know why, other than the fact that if I sent it, it didn't go through for whatever reason, and I apparently asked him to forward it to him.
Q Show you what's been previously marked as Government's Exhibit 5.
A Okay.
Q Do you recognize this document?
A I see what it is, I don't recognize it, but I see what it is, it's a memo.
Q Looking at the second page of Government Exhibit 5, do you recognize that page?
A I don't, but I see what it is.
Q Is that a memorandum that you prepared for Mr. Rose?
A Apparently.
Q For Jeff Rose?
A May have been a copy to Jeff, maybe one to his father.
Q Is there anything on here indicating that it was sent to Vic Rose?
A No.
Q And this was regarding the Raymond Drive property?
A Yes.
Q And this discusses the structure of the transaction that ultimately became the assignment agreement

between Kaleb Realty and Raymond 25?
A Yes.
Q If you look at No. 3, paragraph No. 3, you see that?
A Yes.
Q There is a number $425,000 as a potential first bid for the property at foreclosure, you see that?
A I see that.
Q In the second sentence you write "In the event the IRS wishes to exercise it's rights to redeem it will have to pay the bid price;" do you see that?
A Right, I do.
Q Why were you telling Jeff Rose that the IRS would have to pay the bid price on the property in the event if it wanted to exercise its redemption right?
A That's my understanding of the statute.
Q Was one of the goals of this transaction to set a price high enough that the IRS would not want to redeem the property?
A The price was the three hundred, so, discussions, you've apparently received some things from Panciera which were part of the attorney-client negotiations tactic and you chose, and I'm not going to discuss, I see what it says, but I'm not going to go into my discussions in connection with each paragraph about

what they mean, that's certainly attorney-client.
Q With respect -- even if there was an attorney-client privilege, there is no more, it's been waived.
A By who?
Q Mr. Panciera.
A He can't waive it, it's three members of this entity.
Q Was he the managing partner, is that correct?
A That's right.
Q And you had asked Mr. Panciera to send this to Jeff Rose on your behalf, right?
A Yes.
Q Was Mr. Panciera employed by you in your capacity as an attorney?
A No.
Q So I'll ask you again, did you have any discussions with Jeff Rose regarding setting the bid price sufficiently high that the IRS would not want to redeem the property?
A If I did, it says so here in that paragraph, 425.
Q And I'm asking, other than what's written on the four corners of this document, did you have any discussions with Jeff Rose about that topic?
A I may have. I don't recall. It apparently came in at three hundred thousand.

Q Why did it come in at three hundred thousand?
A That is what we bid because of discussions within the members of the LLC.
Q Did Jeff Rose ever respond to this memorandum?
A I don't recall if he did or if he didn't. If he received this from Hal, he may have responded to Hal. Whether he responded to me, if he responded at all, I just don't recall.
Q Now, paragraph 4, "120 days after foreclosure purchase price is paid." What does that mean?
A After the sale, basically, yes, but a hundred days after foreclosure, a hundred and twenty days, that's what the statute requires, 120 days.
Q When you say purchase price is paid, that refers to what?
A It's probably a mischaracterization of what it's supposed to be. I think it, 120, the statute says 120 days after the sale, which would be the date of the foreclosure, so that was just a mis- characterization.
Q But the deal was structured so that Raymond 25 Associates wouldn't hand over the purchase price of the mortgage to Kaleb Realty until after the 120 days had passed?
A That's right, we wanted a clear title.

Q Was that also to ensure if the IRS actually did redeem, that there would be no out-of-pocket risk to the members of the LLC?
A If we bid three hundred, we paid three hundred, we're not going to risk the IRS coming in within the 120 day window, and, basically, putting together some kind of a package to take the property over and then have to fight with the IRS as well; nobody wants to fight, why go through that if there's going to be issues.
Q The purchase price, the purchase price on the assignment agreement, then went to who?
A The what?
Q Who got the purchase price Raymond 25 was to pay under the assignment agreement, who got that money?
A Attorney-client.
Q Did you ever establish from anybody whether any payments had been made on the Kaleb Realty mortgage before the assignment?
A I was satisfied as to an amount due under that mortgage.
Q How were you satisfied?
A Attorney-client.
Q Let's look at what's been previously marked as Exhibit 8.

A (Complying) Okay.
Q Do you recognize this document?
A I do.
Q What is it?
A It's the agreement between Kaleb Realty and Raymond 25.
Q Look at the first three pages of Exhibit 8, is that the final version of the agreement that was executed --
A I believe so.
Q (Continued) -- between Kaleb Realty and Raymond 25?
A I believe so.
Q Who drafted this document?
A I probably did.
Q And did you send a draft to Jeff Rose?
A I don't recall, but I may have.
Q Why?
A He apparently was in this, his father was involved.
Q Is that what he said?
A I'm sorry?
Q Is that the reason that Jeff told -- did Jeff Rose ask to see a copy of the assignment agreement?
A I don't know whether he asked or his father asked whether I'd send him a copy, I don't recall. Well, I don't recall whether he got a copy of this. He

apparently got a copy of something else, a memo.
Q If you look at the second page of the exhibit, there's a numbered paragraph 4, you see that?
A Yes.
Q And there's reference of some $250,000?
A Yes.
Q Is that the purchase price under the assignment agreement?
A I'll recite the attorney-client privilege for Raymond 25 and for Kaleb.
Q Who drafted this paragraph 4?
A I did.
Q Were there any negotiations about this paragraph?
A There were negotiations about the whole deal.
Q I'm asking about this paragraph, paragraph numbered 4?
A I'm sure there were.
Q If you look at 4, subparagraph E, you see that?
A Yes.
Q "Election by the Internal Revenue Service not to redeem the Premises during the applicable period provided by statute;" you see that?
A Yes.
Q Whose idea was it to insert that into the assignment agreement?

A Raymond 25, I'm sure.
Q Who?
A Raymond 25.
Q Yes, but which person?
A All three of us probably.
Q All at once?
A Well, I probably mentioned to them and we had a discussion, and based upon our discussions, that was considered to be a fairly important aspect of the transaction.
Q Did any money change hands between Raymond 25 and Kaleb Realty before the closing of the sale to the Beauchamps?
A Attorney-client.
Q Look at paragraph 7, you see that?
A Yes.
Q Whose idea was that?
A Probably mine. Well, Raymond 25.
Q What individuals?
A Probably all three of us after discussions.
Q Who initiated the discussion?
A Probably me.
Q Why?
A I'm an attorney, that's why, I look for problems. If we don't, then we're not doing our job.

Q What was the problem you identified?
A There was a 120 day redemption period, that's the problem.
Q And, so, the point of paragraph 7 then was if the IRS intervened, or challenged any aspect of the foreclosure, the validity of the note and/or mortgage, that the deal would be unwound?
A Under the statute the IRS has the right within 120 days to come in and pay the purchase price. If that happens, we want no part of the federal government and all the regulations and rules they have, it's too many real estate deals out there and something like that would have been good, in fact, they intervened at our election, we could just say, you know, we canceled the deal and that's that.
Q And the deal was that no money would change hands between Kaleb Realty and Raymond 25 Associates until the 120 day period had passed and the property had been sold, right, to a third party?
A I will assert the attorney-client privilege as to both Raymond and Kaleb.
Q Was that discussed in negotiations between Kaleb Realty and Raymond 25?
A I didn't hear.
Q Was that discussed in any negotiations between

Raymond 25 and Kaleb Realty?
A Assert the attorney-client.
Q Look at paragraph 8, you see that, it spills over from the second page to the third page?
A Eight?
Q Eight.
A Yes.
Q What was the purpose of that provision?
A Attorney-client privilege. It speaks for itself, but attorney-client as to discussions in connection with it.
Q Did you have any discussions about it with Jeff Rose?
A Don't recall; might have.
Q Look at what's been marked as Exhibit 6.
A Okay.
Q Do you recognize this document?
A No, but I see it.
Q "jtsheehan@aol.com," is that your e-mail address?
A Yes, it is.
Q And "htp319@msn.com," do you understand that to be Hal Panciera's address?
A I do.
Q And "Standish9," you see that?
A I see that.

Q If you look at Exhibit 5, back at Exhibit 5, there's a "Standish9@aol.com," you see that?
A I see that.
Q You understand that to be Jeff Rose's e-mail address?
A It's attorney-client privilege.
Q Going back to Exhibit 6, looking at the middle of the first page, e-mail from you to Hal Panciera, you see that?
A Yes.
Q And then below that there's an e-mail, another e-mail from you to Hal Panciera?
A Yes.
Q You see that it starts "Do I do good work or what;" you see that?
A I do.
Q And that was your e-mail?
A Apparently, yes, it was. Yup.
Q "As you can see, no cash to Seller until deal is done." Did I read that correctly?
A Yes.
Q Is that what you wrote?
A I did.
Q What does that mean?
A It speaks for itself.

Q "...no cash to seller," who's the seller?
A Kaleb Realty.
Q "...until the deal is done," what's the deal? You see "...the deal," what is the deal?
A The deal, apparently whatever agreement we had in place is the deal.
Q What did you have in place?
A An assignment agreement, that's the deal.
Q What we looked at in Exhibit 8?
A That appears to be the deal.
Q Look at the bottom of the first page of Exhibit 6.
A Yes.
Q The e-mail from standish9 to jtsheehan, you see that?
A Yes.
Q "All is fine with agreement," you see that?
A I do.
Q Is that from Jeff Rose to you?
A Attorney-client.
Q You see the signature, it says "jeff" at the bottom?
A I see the word "jeff," yes, I do.
Q Does that indicate to you this e-mail is from Jeff Rose?
A Attorney-client.
Q Does this refresh your recollection as to whether

you provided a draft of the assignment agreement to Jeff Rose?
A Apparently I did.
Q Going to do one more exhibit, it's Government Exhibit 18, feel free to look at whatever you want to look at, but I'm just going to ask you about the first page.
A (Complying) Okay.
Q Ask you about the first page, do you recognize that?
A No.
Q Was there ever an authorization to disburse closing proceeds executed in connection with the sale to the Beauchamps at the Raymond Drive property?
A There may have been, I don't know.
Q Were you authorized to receive and disburse the closing proceeds on the sale to the Beauchamps?
A I may have been.
Q And did you actually disburse those proceeds?
A Attorney-client.
MR. KOVACEV: Two-minute break.
(PAUSE)
MR. KOVACEV: Back on the record.
Q Mr. Sheehan, did you ever disclose the assignment agreement to the Internal Revenue Service?
A Probably not.

Q You say probably not?
A It may have been sent to them with a notice of foreclosure.
Q Do you recall sending it?
A The notice of foreclosure went out -- I think the --
Q Let me know what you're looking at, what exhibit?
A Exhibit No. 22. No, I probably didn't.
MR. KOVACEV: Pass the witness.
MR. MARUSAK: Mr. Sheehan, I have a few questions for you.
THE WITNESS: Strike that, I did.
(By Mr. Kovacev)
Q You did what?
A I did notify the IRS.
Q Did you provide them with a copy of the assignment agreement?
A No, they were given a notice of the foreclosure affidavit which recited that Kaleb was the original holder and was the original mortgagee and Raymond 25 was the mortgage, was the assignee, was the holder of the mortgage.
Q You're looking at the page with Bates number --
A Page 38.
Q I don't understand that. Did you provide any notices or notification about the assignment?

A Probably not.

MR. MARUSAK: Mr. Sheehan, we introduced ourselves to each other earlier, I'm Jim Marusak, I represent the Beauchamps and, also, Dean Bank in this case, and I do have a few questions for you, hopefully I won't be very long.

EXAMINATION BY MR. MARUSAK

Q The first set of questions has to do with some testimony you had given earlier where, as I understood, you said you had sent certain documentation to the Beauchamps' attorney prior to the closing, and when Mr. Kovacev was asking you about the assignment agreement itself, you said it might be the type that you normally would send, but I think your testimony was that you don't have a direct recollection of sending that particular document, or tell me what --

A I don't recollect it, but, obviously, he would want to see that we controlled the mortgage, so he'd have to see it. I don't recall.

Q Let me ask you this. The document which has been marked as Government 13 --

(PAUSE)

Q Just to turn once again to this Exhibit No. 13, you recall this as being a fax that you received

from Peter Hainley?
A I don't recall it, but I see it and I'm sure I received it.
Q That refers to having received the assignment, do you see that?
A Yes.
Q Now, the assignment is the assignment of mortgage which is found at Exhibit 22, Bates Stamp 0041, is it not?
MR. KOVACEV: Objection. You can answer.
A If that's the assignment, which I'm presuming it is, then that's the assignment.
Q That's got your notarized signature, does it not?
A Yes.
Q So, when it says, "We received the assignment..." can we safely assume that the assignment was what we're looking at here, Bates Stamp 0041, Exhibit 22?
A Yes.
Q This does not say anything about receiving the assignment agreement, does it?
A No.
Q Could it be that the assignment was sent and that that satisfied the attorneys that there was an assignment?

A I wouldn't --

MR. KOVACEV: Objection.

A (Continued) I wouldn't have sent them the assignment agreement, that's none of their business.

Q Fair enough, that's my point, because I think that your testimony earlier left open the possibility that the assignment agreement was sent.

A I don't think I would've said that. If I did, I stand corrected. I wouldn't have sent the agreement.

MR. MARUSAK: Thank you. Then that makes this that much shorter.

Q Now, also in that same document, that fax sheet, which is Exhibit 13, there's reference to an accountant's affidavit; do you recall that?

A I see that.

Q Now, did that have to do with a request for understanding how much of a debt was owed on the original mortgage?

A I guess that's why they wanted it. I'm not sure how I responded to them, because it really, I don't recall getting it to them, the accountant's affidavit, because it's really none of their business. I don't know that I gave it to them or not, but...

Q You recall whether or not you gave the amortization schedule of the accountant to the attorneys?
A I don't recall that I did, and...
Q You know if Mr. Panciera did?
A I don't know that he did or he didn't. There may be a tempest in a teacup, you know, you just don't give everything over, you just don't do that. I mean, you recognize what is legitimately required and the assignment would be -- the assignment agreement would not be, I'm not sure why they would want a copy of the accountant's affidavit, nice to have it in the file, but whether they ever received it from me, I don't think I would've sent it to them. I probably argued with them that it's not required and they may have accepted that and the closing went through. I just don't recall having sent this agreement.
Q You're not sure what satisfied them of the evidence of a debt having been owed at one point on the mortgage, or the amount of the debt on the mortgage?
A Well, Raymond 25 was the holder of the mortgage, I'm sure Raymond 25 as the holder satisfied them it was selling the property; the mortgage debts and the fee debts merged at the time Raymond 25 took title, so, at that point, you know, there's no debts, so...

Q In any event, what satisfied the attorney is a better question for that attorney?
A Yeah, I don't recall what satisfied him.
Q And you don't recall what was sent to them, if anything, with regard to the amount?
A Nothing specific, but I'm sure that whatever necessary documents were sent were sent.
Q My next question has to do with the following, a portion of the following sentence which says "I am wondering if you have contacted Jeffrey Rose about signing yet," remember Mr. Kovacev asked you some questions about that?
A Yes.
Q And in relation to that, I'll ask you to take a look at Bate Stamp 086 of that same Exhibit, 13.
A Yes.
Q And that's a communication from a title individual to Peter Hainley, correct?
A Yes.
Q And paragraph 3 says, does it not, "You will need a confirmatory deed for the deed recorded in 485/690?" I assume that's the deed Book 485 Page 690, correct?
A Yes.
Q And it says, "Property held in trust must be conveyed by the trustees. There is no non-resident

withholding language, so you need an Acknowledgement of Discharge of Lien. Also, a Memorandum of Trust needs to be recorded for that transaction," you see that?

A I do.

Q So, what this person is saying is that she at that point suggested something from the trustee in that particular transaction and that transaction refers to 485 Page 690, correct?

A Yes.

Q And this memo was written on June 14, 2006, before the closing, about two weeks before the closing, correct?

A Yes.

Q Now, I'm going to ask you to take a look at that document, 485 Page 690, which is at Book, or, excuse me, Exhibit 22, page 0019 Bate Stamp.

A (Complying) The deed.

Q That matches up Book 485 Page 690?

A Yes.

Q Is that the document that M.L. Rinaldi is referring to in that earlier communication, correct?

MR. KOVACEV: Objection.

A Appears to be.

Q Now, that document, the Quit-Claim Deed, is dated

March 3, 2000, is it not?
A Yes.
Q And it's from Nomar Realty Trust to Borland Realty, Inc., correct?
A Yes.
Q And it's signed by Nomar Realty Trust by the trustee, is it not?
A Yes.
Q And the trustee is J. Rose, is that correct?
A That's what it says, yes.
Q So, when asking for something further concerning the trustee, that would refer to J. Rose, correct?
A Or the present trustee, whomever that may be.
Q Fair enough.
A Yeah.
Q Do you recall having discussions with Mr. Hainley about that particular requirement, that he was asking for something further from the trustee?
A I don't have any particular recollection, but that would have been -- I don't recall anything was done in connection with that situation, I just don't recall that it was. It's asking for things that would've taken some time I think.
Q Let me ask you this.
A I don't know.

Q (Continued) Was it asking for something -- if you look at page Bate Stamp 18, which is the document just before the Quit-Claim Deed --
A Yes.
Q (Continued) -- in Exhibit 22.
A Yes.
Q (Continued) That is the mortgage deed from Nomar Realty to Kaleb, correct?
A Yes.
Q And it's dated April 15, 1993?
A Yes.
Q Which is about seven years earlier than the Quit-Claim Deed that we were just discussing, is it not?
A Yes.
Q And that is the mortgage that was being foreclosed by Raymond Associates?
A Yes.
Q Or had been foreclosed prior to the closing --
A Yes.
Q (Continued) -- with the Beauchamps, correct?
A Yes.
Q Do you recall pointing out to Mr. Hainley that because the interest being foreclosed was prior in time to the Quit-Claim Deed to Borland, that it was

irrelevant as to whether or not the Quit-Claim Deed from Nomar to Borland was, in fact, a valid deed? In other words, since it was junior --
A I don't recall it, but that's accurate what you're saying. I may have said that, at the time it may have meant nothing, excepting the title attorneys are obviously looking to get as much as they can. From a legal point of view, it's irrelevant.
Q So, when the foreclosure takes place, it wipes out everything that is junior to it, isn't that correct?
A Yes.
Q So, whether or not the Quit-Claim Deed from Nomar to Borland was valid or not is really something that is of no consequence to the closing, isn't that correct?
A That's correct.
Q In any event, nothing from Mr. Rose was ever sent to Mr. Hainley prior to the closing?
A I don't believe so. Jeffrey Rose you mean?
Q Yes.
A I don't believe so, no.
Q Was there any other discussion about Jeffrey Rose that you can recall?
A Obviously, he was discussed because of his name and the IRS lien that was attached to the thing, so

certainly, rightly so, there was a concern by the Beauchamps' attorneys that things had been done properly and that's why they asked for some things and settled on where they had a comfortable level.
Q Now, in that regard, the IRS liens that were of record are found also at Exhibit 22, pages Bate Stamp 28, 29, 30, and 31, are they not?
A Yes.
Q And the first one at Bate Stamp 0028 is against Borland Realty, Inc. As Nominee, Alter Ego or Transferee of Jeffrey Rose, is that correct?
A Yes.
Q And Borland, as we earlier discussed, was after any interest -- it came after the mortgage that was being foreclosed, correct?
A Yes.
Q Now, the second lien, which is at Bate Stamp 029, of Exhibit 22, notices Jeffrey Rose, correct?
A Yes.
Q In his individual capacity, isn't that correct?
A Yes.
Q Jeffrey Rose in his individual capacity has never been on title to this property, has he?
A He has not, no.
Q So the time of the closing Jeffrey Rose was not on

title.
A Yes.
Q Borland was junior to the mortgagee, correct?
A Yes.
Q Now, looking at page 30 of Exhibit 22, that's a third IRS lien, and it says "Jeffrey Rose, Nominee of," and it doesn't give anybody's name, does it?
A No.
Q So that doesn't tell us who, other than Jeffrey Rose, the IRS is seeking to attach an interest to, is that correct?
A That's correct.
Q So "Jeffrey Rose, Nominee of," with nothing after it, also does not appear on the title of this property, correct?
A No, no, it does not.
Q And, finally, Bate Stamp 31 is another Notice of Federal Tax Lien, which says "Borland Realty, Inc. as Nominee, Alter Ego, or Transferee of Jeffrey Rose," correct?
A Yes.
Q And, once again, Borland was a junior interest holder, if an interest holder at all, on this property to the mortgagee, and the mortgage that was being foreclosed, isn't that correct?

A That's correct.
Q There's no IRS lien that you know of, or knew of at the time, against Kaleb, was there?
A No.
Q And there is no IRS lien or notice that you knew of, or know of now, against Nomar, is that correct?
A There wasn't, there wasn't. What you've reflected is what is the status of the title or was at the time.
Q And there was no lien or notice as against Raymond at the time of the closing, was there?
A No.
Q Did you or any of the other principals or members of Raymond 25 ever have any direct discussions with either Keith or -- Keith Beauchamp or his brother?
A I did not. Whether Hal Panciera or Don Coletti did, I don't know.
Q Was Don Coletti the listing agent?
A He was a broker, so, he had the property out there for sale and we would contact him, I'm sure Beauchamp contacted him.
Q During the negotiations for the deal with the Beauchamps, all of your communications were with the attorneys at that point, is that correct?
A Yes.

Q Mr. Hainley?
A Hainley, yes.
Q And he was working with Walsh & Brule, is that correct?
A Yes.
Q And I take it the mortgagee, Dean Bank, who provided the cash for the transaction, that is, the sale to Beauchamps, also acted through the attorneys, is that correct?
A I never -- yeah, I never spoke with any representative of them. It may have been through the closing attorney.
Q Do you recall what the sale price was for the property?
A The deed reflects three hundred, I have no reason to disagree. On the sale price, I'm sorry?
Q To the Beauchamps, yeah.
A Oh, something more than that, three and a quarter. I don't recall. Well, I can figure it out.
(PAUSE)
A (Continued) No, it's not here. I don't have a copy of the deed.
Q Yes, thank you. I'm just going to show you Government Exhibit 18, we won't need to mark it.
MR. KOVACEV: It is already.

Q (Continued) Take a look at that, do you recognize that as the HUD 1 statement for the closing?
A Yes.
Q And does it reflect the sales price?
A 330.
Q Now, to your recollection, was $330,000 fair market value for the property that Raymond -- 25 Raymond, is it?
MR. KOVACEV: Objection.
A At the time.
Q One of your partners was a real estate agent and real estate broker at the time, isn't that correct?
A Yes, he was, yup.
Q And did he concur with the sale price as being fair market value?
A Yeah, we all negotiated at that point, we were satisfied that was a fair price.
MR. MARUSAK: I have no further questions.
MR. KOVACEV: Mr. Sheehan, thank you for coming here to visit with us today. I have spoken with your attorney, Mr. O'Neill, about issues regarding your implication of the attorney-client privilege. I think we have made clear I think your implication has been overly broad and I will be

meeting and conferring with Mr. O'Neill after completion of today's deposition. For that reason, I'm just suspending as opposed to closing today's deposition pending resolution of those issues.

(DEPOSITION ADJOURNED AT 3:30 P.M.)